UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

DONNA J. ZIMPFER,

Plaintiff,

v.

HILBERT COLLEGE, MICHAEL BROPHY, PRESIDENT,
KRISTINA LANTZKY, PROVOST AND VICE
PRESIDENT FOR ACADEMIC AFFAIRS, and MAURA
FLYNN, HUMAN RESOURCES DIRECTOR,

Defendants.

Civil Action No. 1:21-cv-00231

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT**

**BOND, SCHOENECK & KING, PLLC**
Christa R. Cook
Suzanne M. Messer
*Attorneys for Defendants*
Office and P.O. Address
One Lincoln Center
Syracuse, New York  13202-1355
Telephone:  (315) 218-8000

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................. 1

ARGUMENT ........................................................................................... 2

POINT I:  PLAINTIFF'S NYSHRL CLAIMS MUST BE DISMISSED AS
AGAINST THE INDIVIDUAL DEFENDANTS ................................ 2

POINT II:  PLAINTIFF'S GENDER DISCRIMINATION CLAIMS MUST BE
DISMISSED ............................................................................... 3

    A.   Summary Judgment Should Be Granted Dismissing Plaintiff's Equal
Pay Act Claim and Plaintiff's New York Labor Law Claim ................... 3

        1.   Plaintiff Cannot Prove a Prima Facie Violation of the EPA ............... 4
        2.   Differentials in Pay Are Because of Reasons Other than
Gender ............................................................................ 6
        3.   Plaintiff Cannot Demonstrate Pretext ........................................ 9

    B.   Summary Judgment Should Granted Dismissing Plaintiff's Title VII
and NYHRL Gender Discrimination Claims ................................. 9

POINT III:  PLAINTIFF'S RACE DISCRIMINATION CLAIMS MUST BE
DISMISSED ............................................................................. 11

POINT IV:  PLAINTIFF'S RETALIATION AND HOSTILE WORK
ENVIRONMENT CLAIMS MUST BE DISMISSED ........................ 14

        1.   Plaintiff's Retaliation Claims Must be Dismissed ......................... 16
        2.   Summary Judgment Must Be Granted Dismissing Zimpfer's
Hostile Work Environment Claims ........................................... 19

POINT V:  PLAINTIFF'S DISABILITY DISCRIMINATION CAUSE OF ACTION
MUST BE DISMISSED .............................................................. 20

    A.   Plaintiff Cannot Establish a Disability Discrimination Claim ................ 20

    B.   Plaintiff Cannot Establish a Failure to Accommodate Claim. ................ 22

        1.   Defendants Provided Plaintiff with Reasonable
Accommodations .............................................................. 22
        2.   Defendants Engaged in the Interactive Process ........................... 23

POINT V:  PLAINTIFF'S "AIDING AND ABETTING" CLAIMS MUST BE
DISMISSED ............................................................................. 23

CONCLUSION ...................................................................................... 24

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allessi v. NYS Dept. of Corrections & Comm. Supervision*,
 16 F. Supp. 3d 221 (W.D.N.Y. 2014) ........................................................ 17

*Black v. Buffalo Meat Serv., Inc.*,
 No. 15-CV-49S, 2021 WL 2043006 (W.D.N.Y. May 21, 2021) ................... 12, 13, 19

*Boonmalert v. City of N.Y.*,
 721 Fed. Appx. 29 (2d Cir. 2018) .............................................................. 24

*Boughton v. Town of Bethlehem*,
 No. 13-CV-01583, 2015 U.S. Dist. Lexis 120413 (N.D.N.Y. Sept. 10, 2015) ..... 21, 23

*Bowen-Hooks v. City of New York*,
 13 F. Supp. 3d 179 (E.D.N.Y. 2014) .......................................................... 17

*Campbell v. Corr. Med. Care, Inc.*,
 No. 14-CV-6136, 2014 WL 2608334 (W.D.N.Y. June 11, 2014) ................................ 4

*Comcast Corp. v. National Ass'n of African Am.-Owned Media*,
 140 S.Ct. 1009 (2020) ............................................................................. 12

*Doe v. Bloomberg, L.P.*,
 36 N.Y.3d 450 (2021) ................................................................................ 2

*Edelman v. NYU Langone Health Sys.*,
 No. 21-CV-502, 2022 WL 4537972 (S.D.N.Y. Sept. 28, 2022) ................... 2, 3, 4, 10

*EEOC v. Port Auth. of N.Y. & N.J.*,
 768 F.3d 247 (2d Cir. 2014) ...................................................................... 3, 4, 5

*Fayson v. Kaleida Health, Inc.*,
 No. 00-CV-0860, 2002 WL 31194559 (Sept. 18, 2002) ............................... 11, 13, 14

*Frilando v. N.Y.C. Transit Auth.*,
 513 F. Supp.3d 356 (S.D.N.Y. 2021) ......................................................... 23

*Gass v. Evergreen Aviation Ground Logistics Enters., Inc.*,
 No. 07-cv-402, 2008 WL 11437035, at *5 (E.D.N.Y. Oct. 15, 2008) ....................... 13

*Hoffman v. St. Bonaventure Univ.*,
 No. 19-CV-679, 2021 WL 37693 (Jan. 5, 2021) ............................................. 9, 10, 16

15298815

*Klinefelter v. LaHood*,
    No. 09-CV-299, 2011 WL 5979022 (Nov. 27, 2011) .......................................... 10, 11

*Lavin-McEleney v. Marist Coll.*,
    239 F.3d 476 (2d Cir. 2001) ................................................................................... 8, 10

*Lehman v. Bergmann Assocs., Inc.*,
    11 F. Supp. 3d 408 (2014) ............................................................................................ 3

*Littlejohn v. City of New York*,
    795 F.3d 297 (2d Cir. 2015) ....................................................................................... 16

*Lyons v. Legal Aid Soc.*,
    68 F.3d 1512 (2d Cir. 1995) ....................................................................................... 22

*McDonnell Douglas Corp. v. Green*,
    411 U.S. 792 (1973) .................................................................................................... 10

*McHenry v. Fox News Network, LLC*,
    510 F. Supp. 3d 51 (S.D.N.Y. 2020) ......................................................................... 24

*Mitchell v. SUNY Upstate Med. Univ.*,
    723 Fed. Appx. 62 (2d Cir. 2018) .............................................................................. 16

*Noll v. IBM Corp.*,
    787 F.3d 89 (2d Cir. 2015) ......................................................................................... 22

*Ottaviani v. SUNY New Paltz*,
    875 F.2d 365 (2d Cir. 1989) ......................................................................................... 8

*Roncallo v. Sikorsky Aircraft*,
    447 Fed. Appx. 243 (2d Cir. 2011) ............................................................................ 17

*Sethi v. Narod*,
    12 F. Supp. 3d 505 (E.D.N.Y. 2014) .................................................................... 17, 19

*Soto v. Marist Coll.*,
    No. 17-CV-7976, 2019 WL 2371713 (S.D.N.Y. June 5, 2019) ................................. 12

*Spiegel v. Schulmann*,
    604 F.3d 72 (2d Cir. 2010) ......................................................................................... 20

*Stevenson v. N.Y.S. Dep't of Corr. & Cmty. Supervision*,
    21-cv-355, 2022 WL 179768 (W.D.N.Y. Jan. 20, 2022) .......................... 2, 16, 19, 24

*Uddin v. City of New York*,
    427 F. Supp. 2d 414 (S.D.N.Y. 2006) ....................................................................... 17

15298815

*Uy v. Mount Sinai Hosp.*,
No. 10-cv-5674, 2012 WL 4560443 (S.D.N.Y. 2012)......................................18

*Vangas v. Montefiore Med. Ctr.*,
6 F. Supp. 3d 400 (S.D.N.Y. 2014) ........................................................... 22

*Walsh v. NYC Hous. Auth.*,
828 F.3d 70 (2d Cir. 2016)...................................................................... 10

*Woodman v. WWOR-TV, Inc.*,
411 F.3d 69 (2d Cir. 2005) ..................................................................... 13

**Statutes**

29 U.S.C. § 206(d)(1) .......................................................................... 3, 4, 6

42 U.S.C. § 1981 ................................................................................... 11

42 U.S.C. § 2000e-2(a)(1) ...................................................................... 10

N.Y. Labor Law § 194................................................................................ 3, 12

**PRELIMINARY STATEMENT**

Defendants Hilbert College (the "College"), Michael Brophy ("Brophy"), Kristina Lantzky-Eaton ("Lantzky"), and Maura Flynn ("Flynn") (collectively ("Defendants") submit this memorandum in support of their motion for summary judgment seeking dismissal of Plaintiff Donna Zimpfer's Complaint (ECF Doc. No. 1).

Zimpfer was a faculty member in the College's Criminal Justice Department from 2004 until her resignation in 2022.  The gravamen of Zimpfer's Complaint is that she was paid less than her colleagues because of her gender and race, and that after she raised her pay complaint with Brophy, the College retaliated against her.  Zimpfer was, in fact, paid less than her colleagues, but the pay disparity was not the result of discrimination.  Zimpfer was paid less than her male **_and_** female colleagues in the Criminal Justice Department, regardless of race or disability status.  Zimpfer's allegations of retaliation center on one day in September of 2019 when access to her email account was restricted for only a few hours while the College addressed a potential security breach.  Despite contemporaneous assurances that this restriction was entirely unrelated to any complaint Zimpfer may have made, Zimpfer's paranoia turned a minor inconvenience into something much larger.

Not only does she allege discrimination on the basis of her gender and race, but she also suspects that the College discriminated against her on the basis of a disability. This irrational belief is simply not supported by reality -- the College accommodated Zimpfer by agreeing to **_every request she made_**.

Zimpfer's Complaint is the quintessential example of "throwing everything against the wall and see what sticks."  It is simply inconceivable that Zimpfer suffered from all of the forms of discrimination that she alleges.  No reasonable person would view the

1

undisputed facts in this case and conclude that Zimpfer was discriminated against or retaliated against.  Summary judgment should be granted.

### **ARGUMENT**[1]

> Summary judgment is appropriate where the record establishes that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. An issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for a nonmoving party. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. A party opposing summary judgment normally does not show the existence of a genuine issue of fact to be tried merely by making assertions that are based on speculation or are conclusory.

*Edelman v. NYU Langone Health Sys.*, No. 21-CV-502, 2022 WL 4537972, at *4 (S.D.N.Y. Sept. 28, 2022) (internal quotations and citations omitted).

### **POINT I:  PLAINTIFF'S NYHRL CLAIMS MUST BE DISMISSED AS AGAINST THE INDIVIDUAL DEFENDANTS**

As an initial matter, "the New York Court of Appeals has stated that the NYSHRL 'does not render employees liable as individual employers.'" *Stevenson v. N.Y.S. Dep't of Corr. & Cmty. Supervision*, 21-cv-355, 2022 WL 179768, at *20 (W.D.N.Y. Jan. 20, 2022) (citations omitted).  Under the New York Human Rights Law ("NYHRL"), "a corporate employee simply does not qualify as an 'employer,' regardless of the employee's position or relationship to the employer."  *Doe v. Bloomberg, L.P.*, 36 N.Y.3d 450, 457 (2021).  Accordingly, Plaintiff's Ninth, Tenth, Eleventh and Twelfth Causes of Action must be dismissed as against Brophy, Lantzky and Flynn as a matter of law.

---

[1] The background facts are set forth fully in Defendants' Statement of Undisputed Material Facts ("*SOF*"), which is based upon the Complaint, Zimpfer's deposition testimony, and the accompanying Declarations of Brophy, Lantzky, Flynn and Dr. Catherine Massey.

15298815

## POINT II:  PLAINTIFF'S GENDER DISCRIMINATION CLAIMS MUST BE DISMISSED

Plaintiff asserts four gender discrimination claims:  Equal Pay Act Violations (First Cause of Action), Title VII Gender Discrimination (Third Cause of Action), Willful Pay Discrimination in violation of N.Y. Labor Law § 194 (Seventh Cause of Action), and Gender Discrimination in violation of the NYHRL (Ninth Cause of Action).  Summary judgment dismissing each of these claims is warranted.

### A.  Summary Judgment Should Be Granted Dismissing Plaintiff's Equal Pay Act Claim and Plaintiff's New York Labor Law Claim[2]

Plaintiff's first cause of action alleges that the College violated the Equal Pay Act ("EPA").  *Complaint*, ¶¶ 109-114.  "[T]o prove a violation of the EPA, a plaintiff must demonstrate that "(1) the employer pays different wages to employees of the opposite sex; (2) the employees perform equal work on jobs requiring equal skill, effort, and responsibility; and (3) the jobs are performed under similar working conditions." *EEOC v. Port Auth. of N.Y. & N.J.*, 768 F.3d 247, 254-55 (2d Cir. 2014); *see* 29 U.S.C. § 206(d)(1).  The plaintiff bears the *demanding* burden of proving a *prima facie* case of an EPA violation.  *Id.*, at 255.  The burden then shifts to the employer to demonstrate that a "wage disparity is justified by one of the affirmative defenses provided under the Act."  *Edelman*, 2022 WL 4537972, at *5 (S.D.N.Y. Sept. 28, 2022) (citation omitted).

> Affirmative defenses under the EPA include showing a "(i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex." 29 U.S.C. § 206(d)(1). "Once the employer proves that the wage disparity is justified by one of the EPA's four affirmative defenses, the plaintiff may counter the employer's affirmative defense by producing evidence that the reasons the defendant seeks to advance are

---

[2] A claim under New York's Equal Pay Act (New York Labor Law § 194) is analyzed under the same standards applicable to the federal Equal Pay Act.  *Lehman v. Bergmann Assocs., Inc.*, 11 F. Supp. 3d 408 (W.D.N.Y. 2014).  Accordingly, for the same reasons with respect to the First Cause of Action, Plaintiff's Seventh Cause of Action must be dismissed.

15298815

actually a pretext for sex discrimination."  *Ryduchowski v. Port Auth. of N.Y. & N.J.*, 203 F.3d 135, 142 (2d Cir. 2000) (internal quotation marks omitted); *accord Boatright*, 2020 WL 7388661, at *11.

*Id.*

### 1. Plaintiff Cannot Prove a Prima Facie Violation of the EPA

Plaintiff alleges that she was paid less than three male professors and two female professors.  *Complaint*, ¶¶ 65-68.[3]  The proof actually shows that Zimpfer was paid less than both male *and* female full-time faculty members in the Criminal Justice Department.  *Massey Decl. Exs. B & C.*  Of course, Zimpfer's allegation concerning the pay of the two female professors (*Complaint*, ¶¶ 66, 67) cannot support a *prima facie* violation of the EPA, because the difference in pay is not between "employees of the opposite sex."  29 U.S.C. § 206(d)(1).  That Zimpfer was paid less than both female and male faculty members in her Department, however, weighs against her allegations that gender was the cause of any pay disparity.

Nor do her allegations of disparate pay between her salary and those of the three male professors establish a *prima facie* violation of the EPA.  Zimpfer must prove that the jobs require equal skill, effort and responsibilities.  Whether a job requires equal skill requires consideration of "'such factors as experience, training, education, and ability…'"  *Port Authority of NY*, 768 F.3d at 255 (quoting 29 C.F.R. § 1620.15(a)).  She must also prove "equal effort," as measured by the "physical and mental exertion

---

[3] Plaintiff also alleges that she was paid less than professors that are "not Native American" or "whose skin is not brown."  *Complaint*, ¶¶ 65-68.  These race or national origin-based allegations cannot form the basis for a violation of the EPA, which is directed solely at wage disparities caused by gender.  *Campbell v. Corr. Med. Care, Inc.*, No. 14-CV-6136, 2014 WL 2608334, at *2 (W.D.N.Y. June 11, 2014) (dismissing EPA claim where the plaintiff alleged disparate pay because of her race, rather than her gender).

needed for the performance of [the] job" and "equal responsibility," which considers "the degree of accountability required in the performance of the job." *Id.* (quoting 29 C.F.R. §§ 1620.16(a), 1620.17(a)).[4]

Zimpfer holds a master's degree in Criminal Justice, and has peace officer, firearms and hostage negotiation training. *SOF*, ¶¶ 6-7. Prior to her employment at the College, she had only one year of teaching experience. *Zimpfer Depo.*, at 18-20, 22; *Brophy Decl.*, *Ex. A*. She taught as an adjunct at the College for three years and became a full-time faculty member in 2007. *SOF*, ¶¶ 4-5. Zimpfer teaches in the Criminal Justice Department. She has never taught any of the Forensic Science Department's curriculum. *Id.*, ¶ 8.

Zimpfer alleges that two male professors in the Criminal Justice Department who were hired after her but were paid more than her. *Complaint*, ¶ 65. The referenced professors are John Culhane and Mark Paoni. *SOF*, ¶¶ 17-22. The undisputed facts demonstrate that Zimpfer does not hold the same "experience, training, education, and ability" as either Culhane or Paoni. Culhane maintained a terminal degree, specifically a Juris Doctorate, at the time of his hire, and was previously employed by the FBI as an FBI Certified Instructor and firearms instructor. *Id.*, ¶¶ 18, 19. Paoni holds not only a Master of Science degree but also a doctorate in Educational Leadership. *Id.*, ¶ 21. Paoni also has over a dozen areas of special training and certifications, including Defensive Tactics Instructor, D.A.R.E Instructor, Police Baton Instructor, Background Investigator, and a Firearms Sharpshooter. *Id.*, ¶ 22.

---

[4] For purposes of this motion only, Defendant assumes that the working conditions of Zimpfer and the alleged comparators are similar.

Nor did Zimpfer's position as a faculty member require equal effort or responsibility as Culhane and Paoni's positions. Both Culhane and Paoni assumed additional duties beyond their teaching duties at the College. Culhane not only developed a new undergraduate degree program in Intelligence, but he also served as the Chair of the Criminal Justice/Forensic Science Division for four years. *Id.,* ¶ 19. Paoni served as the Assistant Chair of the Criminal Justice Studies Division. *Id.*, ¶ 22.

Zimpfer's Complaint references a professor in paragraph 68 who she describes as a male Assistant Professor. This is a reference to Professor John Reinholz. As with Culhane and Paoni, Zimpfer's position did not involve equal skill, effort, and responsibility to that of Reinholz's. Reinholz is not a professor in the Criminal Justice Department; rather, he teaches in the Forensic Science Department. *SOF*, ¶ 24. Zimpfer never taught any of the forensic science curriculum. Further, at the time of his hire, he had significant prior teaching experience. *Id.* Reinholz has a Master of Arts degree and has completed some requirements towards his Ph.D. *Id.* He maintains multiple certifications through the State, has police media training, and has attended various professional development courses. *Id*.

Zimpfer was less educated, had less teaching experience, had less specialized training and performed fewer duties than each of the male professors she attempts to compare herself to in her Complaint. Accordingly, she cannot meet the demanding burden of proving a *prima facie* violation of the EPA.

**2. Differentials in Pay Are Because of Reasons Other than Gender**

Even if Zimpfer could establish a *prima facie* violation of the EPA (she cannot), any disparity in pay between Zimpfer and her male colleagues are for reasons entirely unrelated to gender. 29 U.S.C. § 206(d)(1). In addition to gender, the primary factor

6

that Zimpfer alleges in her Complaint to support her claim of discrimination in pay is date of hire. *See Complaint*, ¶¶ 65, 68.[5] The proof demonstrates that while term of employment at the College is one factor that is considered in faculty compensation decisions, it is not the only consideration. Rather, starting salaries for faculty members in higher education are largely driven by external market conditions. *Brophy Decl.*, ¶ 11. The reputation and success of a college is highly dependent on its ability to hire top academic talent. *Id*. Differences in faculty salaries can be caused by a multitude of factors, including when individuals are hired, individual skills, the possession of or lack of terminal degrees, experience and qualifications, market demand and salary compression. *Id.*, ¶ 23. As discussed in part I.A., such factors influenced the compensation of the three male professors that Zimpfer alleges were paid more than her. The professors Zimpfer cites all had terminal degrees or were in the process of obtaining additional terminal degrees (Zimpfer did not); had multiple additional or specialized certifications or areas of study that Zimpfer did not have; had more teaching experience in higher education than Zimpfer prior to their hiring at the College; and negotiated higher salaries than Zimpfer at the time of their hire. *SOF*, ¶¶ 17-22, 24.

A salary study performed at the College's request by Welch Consulting in 2021 (the "Faculty Salary Study") confirmed that gender played no role in differences in salaries at the College. To analyze the salary data, Welch Consulting used multiple regression analysis, a statistical technique used to analyze the relationship between a

---

[5] Zimpfer does allege that Reinholz has a "lower title" than her and taught fewer courses than her. *Complaint*, ¶ 68. This allegation is not borne out by the proof. Unless a release is granted, full-time faculty members were required to teach the same course load. *Lantzky Depo.*, 18-19. Further Reinholz had significantly more prior teaching experience than Zimpfer when he was hired and taught in the specialized field of forensic science; Zimpfer had almost no teaching experience prior to her hiring and never taught forensic science courses. *SOF*, ¶ 19.

7

single dependent variable and several independent variables.  This type of analysis allows labor economists to estimate average gender differences in pay while controlling for factors that affect pay.  *Massey Decl.*, ¶ 8.  "It is undisputed that multiple regression analysis…is a scientifically valid statistical technique for identifying discrimination." *Lavin-McEleney v. Marist Coll.*, 239 F.3d 476, 482 (2d Cir. 2001) (citing *Ottaviani v. SUNY New Paltz*, 875 F.2d 365, 366-67 (2d Cir. 1989)).  In cases involving claims of gender discrimination, multiple regression analysis can be used "to isolate the influence of gender on employment decisions relating to a particular job or job benefit, such as salary."  *Ottaviani*, 875 F.2d at 367.  The results of the regression analysis confirmed that when controlled for factors that affect compensation at the College (i.e., terminal degree status, department/course of study, rank, prior teaching experience and length of employment), women faculty members did earn less than men, but the difference was negligible, or "not statistically significant."  *Massey Decl.*, ¶ 12 & Ex. B.

Welch Consulting "checked" the results of the multiple regression analysis by performing a second test, known as the Mann-Whitney-Wilcoxon test, which examines if the pay distribution of men and women is statistically the same.  *Id.*, ¶ 13.  This test does not consider the factors considered by the College when determining faculty compensation.  *Id.*  The Mann-Whitney-Wilcoxon test was run by pooling all faculty together, and then separately by department and rank.  The results of the "all faculty" and "by department" tests showed no statistically significant difference in the male and female distributions of compensation.  *Id.*, ¶ 14.[6]

---

[6] The test run by faculty "rank" indicated a significantly significant difference in the distributions of male and female pay among Assistant Professors; however, the test did not account for the factors considered by the College in making compensation decisions such as terminal degree status, department/course of study, prior teaching experience, or length of employment.

15298815

The College nonetheless was in a sufficiently stable financial condition in June of 2021 to increase certain faculty salaries to address salary compression throughout the College.  Prior to implementing a salary adjustment, the College asked that Welch Consulting re-run the Faculty Salary Study to ensure that the proposed salary increases did not have an unintended impact on salary disparities between men and women faculty members. *Id.*, ¶ 15 & Ex. C.  The results of the revised Faculty Salary Study did not change the overall conclusion that there was not a statistically significant difference in the pay of men and women faculty at the College.  *Id.*, ¶¶ 16-18.  Accordingly, several faculty members, including Zimpfer, were awarded salary increases.  *SOF*, ¶ 13.

Based on the above, the College has met its burden to demonstrate that differences in pay between Zimpfer and male faculty members was based on legitimate, nondiscriminatory factors.

### 3. Plaintiff Cannot Demonstrate Pretext

Plaintiff will not be able to demonstrate that the College's legitimate, nondiscriminatory reasons for the wage disparity was pretextual.  *Hoffman v. St. Bonaventure Univ.*, No. 19-CV-679, 2021 WL 37693, at *5 (W.D.N.Y. Jan. 5, 2021).  The College's proffered reasons for any pay disparity between Zimpfer and her male colleagues cannot be disputed and are supported by admissible statistical analysis.  Accordingly, Plaintiff's EPA violation must be dismissed.

### B. Summary Judgment Should Granted Dismissing Plaintiff's Title VII and NYHRL Gender Discrimination Claims

Plaintiff's Third and Ninth Causes of Action alleging gender discrimination under Title VII and the NYHRL are based on the same allegations of unequal pay as her EPA claim.  *Compare Complaint*, ¶¶ 108-114 with ¶¶ 120-122 and ¶¶ 151-158.  Like the

15298815

EPA, Title VII makes it unlawful for employers to discriminate against employees "because of such individual's…sex."  42 U.S.C. § 2000e-2(a)(1).  "The Equal Pay Act and Title VII must be construed in harmony."  *Lavin-McEleney*, 239 F.3d at 483.

At the summary judgment stage, Title VII "discrimination claims are governed…by the burden-shifting analysis first established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)." *Edelman*, 2022 WL 4537972, at *7.[7]  Under this analysis, the plaintiff bears the initial burden of establishing a *prima facie* case of discrimination by proving that "(1) she was within the protected class; (2) she was qualified for the position; (3) she was subject to an adverse employment action; and (4) the adverse action occurred under circumstances giving rise to an inference of discrimination."  *Walsh v. NYC Hous. Auth.*, 828 F.3d 70, 75 (2d Cir. 2016).  If plaintiff proves a *prima facie* case by a preponderance of the evidence, the burden shifts to the employer to "articulate some legitimate, nondiscriminatory reason for its action." *Hoffman* 2021 WL 37693, at *4.  If the employer meets its burden, the burden shifts back to the Plaintiff to show that the employer's reason was pretextual.  *Id.*  At this stage, "the question becomes whether the evidence, taken as a whole, supports a sufficient rational inference of discrimination."  *Klinefelter v. LaHood,* No. 09-cv-299, 2011 WL 5979022, at *4 (Nov. 27, 2011).  "It is not enough…to disbelieve the employer; the factfinder must [also] believe the plaintiff's explanation of intentional discrimination." *Id.*  Thus, while the requirements to prove a violation of the EPA and Title VII are generally the same, a Title VII plaintiff must also produce evidence of discriminatory

---

[7] "New York State Human Rights Law also has the same burden of proof and burden shifting from *McDonnell Douglas*…for Title VII claims."  *Hoffman*, 2021 WL 376963, at *5.  Accordingly, this point addresses both causes of action simultaneously.

animus to succeed on a claim of gender discrimination. *Id*. Importantly, "[a]t all times" "the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains…with the plaintiff." *Id.* (quoting *Texas Dept. of Comm. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)).

For the same reasons discussed in part I.A.1, above, Zimpfer cannot prove a *prima facie* case of gender discrimination under Title VII or the NYHRL, and the College has proffered legitimate, nondiscriminatory reasons for any wage disparity (Point I.A.2). To succeed on her gender discrimination claims, plaintiff must carry the burden of persuasion on the factor of intent, and she cannot do so. Plaintiff's proof of gender discrimination is based only on the wage disparity between male colleagues and herself:

> Q: …And so what happened that caused you to believe you were being discriminated against on the basis of your gender?
>
> A: When I learned that both males and females in my department or division were earning more than me, I was earning less than everyone in the division, almost many had been there only a fraction of the time that I had been employed there.

*Zimpfer Depo.*, at 138-139. "This wage disparity, standing alone, however, is insufficient to survive a motion for summary judgment." *Klinefelter*, 2011 WL 5979022, at *5 (quoting *Fayson v. Kaleida Health, Inc.*, No. 00-CV-0860, 2002 WL 31194559, at *6 (Sept. 18, 2002)). Zimpfer's failure to identify any discriminatory animus requires dismissal of her Title VII and NYHRL claims.

## POINT III:  PLAINTIFF'S RACE DISCRIMINATION CLAIMS MUST BE DISMISSED

Plaintiff alleges three race discrimination claims:  Discrimination Based on Race and Ethnicity in violation of 42 U.S.C. § 1981 (Second Cause of Action), Discrimination Based on Race and Color in violation of Title VII (Fourth Cause of Action) and

11

Discrimination pursuant to NY Labor Law § 194.[8]  Summary judgment dismissing each

of these claims is warranted.

> "To establish a claim under 42 U.S.C. § 1981, a plaintiff must allege
> sufficient facts to support the following elements: (1) the plaintiff is a
> member of a racial minority; (2) an intent to discriminate on the basis of
> race; and (3) the discrimination concerned one or more of the activities
> enumerated in the statute…

*Black v. Buffalo Meat Serv., Inc.*, No. 15-CV-49, 2021 WL 2043006, at *13 (W.D.N.Y.

May 21, 2021), *aff'd*, No. 21-1468, 2022 WL 2902693 (2d Cir. July 22, 2022) (citations

omitted).[9]  To prevail on a 1981 claim, a plaintiff must "ultimately prove that, but for race,

it would not have suffered the loss of a legally protected right."  *Comcast Corp. v.*

*National Ass'n of African Am.-Owned Media*, 140 S.Ct. 1009, 1019 (2020).

As with Plaintiff's Title VII gender discrimination claims, to succeed on a Title VII

race discrimination claim, a plaintiff must show that: "(1) he was a member of a

protected class; (2) he was qualified for the position; (3) he suffered an adverse

employment action; and (4) that action took place under circumstances giving rise to an

inference of discrimination."  *Soto v. Marist Coll.*, No. 17-CV-7976, 2019 WL 2371713,

at *3 (S.D.N.Y. June 5, 2019).

---

[8] As stated above, Section 194 claims are analyzed under the same framework as EPA claims.
The EPA, however, applies only to gender-based claims.  Because EPA and Title VII claims are
required to be read harmoniously, and because the framework for analyzing such claims is
substantially similar, Defendants' analysis of Plaintiff's NY Labor Law § 194 claims as they
relate to race and retaliation will be analyzed herein pursuant to the Title VII burden shifting
framework.

[9] Plaintiff alleges that she is Native American.  *Complaint*, ¶ 1.  The College has no reason to
dispute this allegation, and accepts for purposes of this motion, that Zimpfer is a member of a
protected class on the basis of her race.

15298815

Plaintiff's race claims arise out of allegations of unequal pay and are grounded in speculation that her colleagues are not Native American because they do not have brown skin.  *Complaint,* ¶¶ 65-68.  Her "self-comparison with other workers, does not raise a genuine issue of fact."  *Fayson*, 2002 WL 31194559, at *6 (W.D.N.Y. Sept. 18, 2002).

Further, there is no evidence that any of the Defendants *knew* that Zimpfer was Native American, let alone based any compensation decisions on her race.  When discussing her salary complaint with Brophy in June 2019, Zimpfer never mentioned race as being a cause of her perceived salary disparity.  Rather, she only asserted her belief that she was paid less on the basis of her gender.  *See Brophy Decl., Ex. F.*  Nor did she allege race as a basis for her Workplace Harassment Complaint.  *Flynn Decl., Ex. A*. Zimpfer testified during her deposition that she "believed" that she submitted a form to the College identifying her race, but that she could not recall the name of the document, when she submitted it or even who she submitted the document to.  *Zimpfer Depo.*, at 143-44, 195-96.  Each of the defendants deny such knowledge.  *Brophy Decl.,* ¶ 50; *Lantzky Decl.*, ¶ 33; *Flynn Decl.*, ¶ 26.  Zimpfer admits that Dr. Brophy never indicated to her that he had looked at her personnel file.  *Zimpfer Depo.*, at 144.

Without knowledge of her race, Zimpfer cannot establish an intent on the part of any of the defendants to discriminate against her on the basis of her race or that her pay was in any way based on her race.  *See Black*, 2021 WL 2043006, at *28; *Woodman v. WWOR-TV, Inc.,* 411 F.3d 69, 82 (2d Cir. 2005) ("discriminatory intent cannot be inferred, even at the *prima facie* stage, from circumstances unknown to the defendant."); Gass *v. Evergreen Aviation Ground Logistics Enters, Inc.*, No. 07-cv-402,

2008 WL 11437035, at *5 (E.D.N.Y. Oct. 15, 2008) (denying plaintiff's summary judgment motion where there was no evidence of potential employer's knowledge of his race); *Fayson*, 2002 WL 31194559, at *6 (denying Title VII claim for unequal pay where plaintiff failed to establish a genuine issue of fact that she was discriminated against on the basis of race or sex and holding that "wage disparity, standing alone, is insufficient to survive [defendant's] motion for summary judgment" (collecting cases)).

### POINT IV:  PLAINTIFF'S RETALIATION AND HOSTILE WORK ENVIRONMENT CLAIMS MUST BE DISMISSED

Zimpfer's Fifth, Sixth, Eighth, Tenth and Eleventh Causes of Action allege retaliation and a hostile work environment in violation of Title VII, Section 1981, the New York Labor Law, the NYHRL.  The claims are based on the same operative facts: that following Zimpfer's complaint of unequal pay, the College retaliated by restricting access to her email account in an effort to "increase their digital surveillance" of Zimpfer. *Complaint*, ¶¶ 81-90.[10]

Zimpfer met with Brophy on June 5, 2019 to discuss her salary concern with him. *SOF,* ¶¶ 26-29.  Thereafter, she filed an internal complaint of gender discrimination with the College's Title IX Officer.  *Id.*, ¶ 31.[11]

On September 12, 2019, the College identified unusual activity occurring on its Blackboard learning management system.  According to logs of Blackboard activity, the same IP address was used to log into the Blackboard accounts of four employees.

---

[10] Zimpfer's retaliation hostile work environment claims also appear to incorporate her allegations of disability discrimination (*see Complaint*, ¶¶ 94-101), which are addressed in Point IV.

[11] Zimpfer elected not to pursue this complaint through the College's internal process, choosing instead to pursue her complaint before the Division of Human Rights. *Zimpfer Depo*., at 106.

*Lantzky Decl.*, ¶ 18.  Matthew Holmes, an employee in the College's Information Technology Department, suggested to Lantzky that such activity may have been caused by corruption of user passwords or by the unauthorized use of user passwords. Because of the possibility that the unusual Blackboard activity could have been caused by the unauthorized use of passwords, Holmes recommended that the College temporarily restrict the four affected users' access to systems available through the singular login until the College was able to determine whether their passwords had, in fact, been compromised. *Id.*, ¶ 19.  Brophy agreed that it was necessary to secure the College's electronic systems and directed that access to the accounts of the four users be restricted temporarily.  *Id.*, ¶ 20.  At Brophy's direction, Flynn contacted Zimpfer to inform her of the temporary disruption in access to her accounts.  *Id.*, ¶ 22.  As a result, Zimpfer temporarily lost access to her College email account.  Her use of Blackboard to communicate with students was not ultimately affected.  *Id.*, ¶ 21; *Complaint,* ¶ 8.

Lantzky also spoke with Zimpfer on September 12, because Zimpfer had expressed her belief to Flynn that the College was restricting her access to email because the College wanted to "get rid of" Brophy's June 5 email to her.  *Id.*, ¶ 23. Lantzky informed Zimpfer that the two issues were unrelated, that the College hoped the issue would be resolved by the end of the day and that nothing was going to be deleted from her email. *Id*.

The restriction on access to the accounts of these four employees, including Zimpfer, was a precautionary measure to ensure that no party other than Zimpfer had access to College systems through the unauthorized use of her password.  At no time was Zimpfer suspected of any improper activity; rather, the College's concern was that

Zimpfer's password had been compromised by an outside party.  *Id.*, ¶ 24.  As soon as it was confirmed that there had been no unauthorized use of Zimpfer's password, Holmes restored Zimpfer's access to her email.  *Id.*, ¶ 26.  She was only without access for a period of hours.  *SOF.*, ¶ 27.

### 1. Plaintiff's Retaliation Claims Must be Dismissed

To prove retaliation under Title VII, Section 1981, and the NYHRL, Zimpfer must demonstrate that (1) she was engaged in a protected activity; (2) that the College was aware of the activity; (3) that she suffered a materially adverse action; and (4) a causal connection between the adverse action and the protected activity.  *Mitchell v. SUNY Upstate Med. Univ.*, 723 Fed. Appx. 62, 63 (2d Cir. 2018).[12]  The same burden shifting analysis applicable to discrimination claims applies to retaliation claims.  *Id.*  To meet her burden of establishing pretext, "the plaintiff must show 'that the adverse action would not have occurred in the absence of retaliatory motive.'"  *Id.* (quoting *Kwan v. Andalex Grp., LLC*, 737 F.3d 834, 846 (2d Cir. 2013)).  This Court has observed that an "alleged retaliatory hostile work environment does not create two separate claims." *Stevenson*, 2022 WL 179768, at *5 (citation omitted).  A "retaliatory hostile environment, if established, is an element of a *retaliation* claim…namely, that the plaintiff suffered an adverse employment action."  *Id.*  While "adverse employment action" in the context of retaliation is broader than it is in the context of discrimination, it "does not encompass 'trivial harms.'"  *Id.* (quoting *Shulz v. Cong. Shearith Isr. of N.Y.C.*, 867 F.3d 298, 309 (2d Cir. 2017) (quoting *Tepperwien v. Entergy Nuclear Ops., Inc.*, 663 F.3d 556, 68 (2d

---

[12] *Littlejohn v. City of New York*, 795 F.3d 297, 315 (2d Cir. 2015) (noting that retaliation claims under Title VII and Section 1981 are analyzed under the same standards); *Hoffman*, 2021 WL 376963, at *5 ("New York State Human Rights Law also has the same burden of proof and burden shifting from *McDonnell Douglas*…for Title VII claims.")

15298815

Cir. 2011) ("Title VII does not protect an employee from 'all retaliation,' but only 'retaliation that produced an injury or harm.'")).

Zimpfer' retaliation claims cannot succeed because she suffered no adverse employment action and there was no connection between her complaint of discrimination and the brief interruption of her email service.[13]  An "adverse employment action" is a **_materially_** adverse change in the terms, privileges, duration and conditions of employment.  *Allessi v. NYS Dept. of Corrections & Comm. Supervision*, 16 F. Supp. 3d 221, 227 (W.D.N.Y. 2014) (emphasis added).  Zimpfer suffered no adverse employment action when her email was temporarily suspended for a few hours.  *See Roncallo v. Sikorsky Aircraft*, 447 Fed. Appx. 243, 245-46 (2d Cir. 2011) (temporary relocation from an office to a cubicle workspace was not an adverse employment action).  Zimpfer's inability to access her email for a short time did not impact her ability to do her job; she could still continue to utilize the learning management system and communicate with students through that platform.  *Sethi v. Narod*, 12 F. Supp. 3d 505, 528 (E.D.N.Y. 2014) (an adverse employment action must constitute "an intolerable alteration to the plaintiff's working conditions, so as to substantially interfere with or impair his ability to do its job").  Further, Zimpfer's allegation that the College was attempting to "increase their digital surveillance" of her (*Complaint*, ¶ 90), is not only a fiction of her own imagination, but, even if true, does not constitute an adverse employment action.  *Uddin v. City of New York*, 427 F. Supp. 2d 414, 429 (S.D.N.Y. 2006) ("courts in this circuit have found that reprimands, threats of disciplinary action

---

[13] To the extent Zimpfer is claiming that Brophy somehow threatened an adverse employment action in his email of June 5, 2019 concerning the return her employment contract (he did not), the "mere threat of discipline is not an adverse employment action" and cannot support a retaliation claim.  *Bowen-Hooks v. City of New York*, 13 F. Supp. 3d 179, 212 (E.D.N.Y. 2014).

*and excessive scrutiny* do not constitute adverse employment actions in the absence of other negative results…" (emphasis added)).  Of course, no one at the College accessed, read or deleted anything from Zimpfer's email account during the time that it was restricted.  *Brophy Decl.*, ¶¶ 40, 42; *Zimpfer Depo.*, at 126.  Nor was the temporary interruption in Zimpfer's email service related at all to her salary complaint.  *Lantzky Decl.*, ¶¶ 30-32; *Brophy Decl.*, ¶ 41.  Rather, it was in response to an intervening event -- to address an identified potential threat to the security of the College's electronic systems. *Id.*; *see Uy v. Mount Sinai Hosp.*, No. 10-cv-5674, 2012 WL 4560443 (S.D.N.Y. 2012) (noting that an intervening event between the protected activity and an adverse action negates any inference of retaliation).  Even if Zimpfer could establish a *prima facie* case of retaliation, Zimpfer will not be able to show that the College's legitimate, nondiscriminatory reason for restricting access to her email account (*i.e.*, to address an  potential threat to the security of its electronic systems) was pretextual.

To the extent Zimpfer is claiming retaliation based on disability discrimination (*see Complaint*, ¶¶ 171, 181), the crux of such allegations is that the College scrutinized her medical documentation in a manner that was different from prior experiences with the College. *Id.*, ¶ 101-02; *Zimpfer Depo.*, at 150.  Accommodation requests involve fact-specific determinations and are dependent upon the circumstances of each situation. *Flynn Decl.*, ¶ 9.  Zimpfer's accommodation requests in 2019 differed from the requests she made in 2017 and 2018.  For example, in 2017-2018, Zimpfer sought time off from her teaching responsibility, whereas, in 2019, she was seeking to continue teaching without coming onto campus and the requests impacted ongoing courses with enrolled students.  *Id.,* ¶ 25 .  In both situations, Zimpfer was required to produce

medical documentation to the College.  *Id.* & *Ex. N*.; *see Sethi*, 12 F. Supp. 3d at 530 (noting that requiring an employee to supply medical documentation for sick leave is not an adverse employment action). Notably, Flynn informed Zimpfer in 2019 that the process of requesting sick leave had, in fact, been changed to make it easier and more convenient for employees on an approved medical leave. *Flynn Decl., Ex. H*.  Zimpfer's allegations of disability retaliation are not supported by the record.

### 2. Summary Judgment Must Be Granted Dismissing Zimpfer's Hostile Work Environment Claims

Hostile work environment claims under Title VII, § 1981, and the New York State Human Rights Law share the same elements. Plaintiff needs to prove that the "workplace is permeated with 'discriminatory intimidation, ridicule and insult,' " that is so "severe or pervasive" to create an "objectively hostile or abusive work environment," and plaintiff "subjectively perceive[d] the environment to be abusive," *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21-22, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) (quoting *Meritor Sav. Bank v. Vinson*, 477 U.S. 57, 65, 67, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986)). Thus, Plaintiff must "not only allege that she found the environment offensive, but that a reasonable person also would have found the environment to be hostile or abusive," *Bentivegna v. People's United Bank*, No. 2:14-cv-599, 2017 WL 3394601, at *13 (E.D.N.Y. Aug. 7, 2017), *citing Harris, supra*, 510 U.S. at 21-22, 114 S.Ct. 367.

*Black*, 2021 WL 2043006, at *11.  To the extent Zimpfer's Complaint can be read to allege a hostile work environment claim outside of the context of retaliation, it still fails. In evaluating such a claim, courts consider " the frequency of the alleged discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."  *Stevenson*, 2022 WL 179768, at *11 (internal quotation omitted).  The interruption in Zimpfer's access to her email occurred one time, was brief and did not interfere with her ability to perform her functions as a professor.  No rational person

15298815

would have perceived the brief interruption in email service to have created an objectively hostile work environment, and her claim must be dismissed.

## POINT V:  PLAINTIFF'S DISABILITY DISCRIMINATION CAUSE OF ACTION MUST BE DISMISSED

### A.  Plaintiff Cannot Establish a Disability Discrimination Claim

Disability discrimination claims under the NYHRL are analyzed under the burden-shifting framework set forth in *McDonnell Douglas Corp. See, e.g.*, *Spiegel v. Schulmann*, 604 F.3d 72, 80 (2d Cir. 2010).

In support of her disability discrimination claim, Plaintiff asserts that Defendants barred her from campus for one week because of her disability (*Complaint* ¶ 19, 98 & 180).  However, Zimpfer acknowledged during her deposition that, during that one-week period, she was never notified by anyone at the College that she was not allowed to be on campus, the College was attempting to clarify her new medical restrictions, she never attempted to enter the College campus, and she was never denied access to the College's campus. *Zimpfer Depo.,* at 184.

The doctor's notes concerning Zimpfer's medical restrictions in September and October 2019 provided no information about the nature of her medical condition. *Flynn Decl. Ex. D*. Zimpfer requested an extension of her temporary accommodation allowing her to teach remotely. Prior to this request, however, Zimpfer had already directed her students to come to class on campus.  Accordingly, the College assigned substitute instructors to teach Plaintiff's on-campus courses.  *Id.* ¶ 15.  Plaintiff was not banned from campus, and she continued to be paid without any reduction in her sick leave accrual.  *Id,* ¶ 16. The College did not learn of the nature of Plaintiff's medical condition until October 31, and at that time agreed to allow Plaintiff to teach her on-campus

courses in a hybrid format – as Zimpfer requested – until the end of the Fall 2019 semester.  *Id.,* ¶ 19 & *Ex. H*. Thus, Plaintiff's assertion that she was subjected to disability discrimination and barred from campus is not supported by the record.

Plaintiff also alleged that, for the Fall 2020 semester, amidst the COVID-19 pandemic, Defendants insisted that she submit medical documentation to teach remotely, but one other professor within the Criminal Justice Studies Department was allowed to teach remotely without having to submit any medical documentation. *Complaint,* ¶ 104.  The College required any faculty member seeking to teach remotely because of an underlying medical condition to provide medical documentation.  *Flynn Decl.*, ¶ 21 & Ex. J.  Zimpfer's request to teach remotely was granted.  *Id.*, ¶ 22 & Ex. K. The referenced faculty member did not seek to teach remotely because of an underlying medical condition; rather, she sought to teach remotely because her age placed her at a higher risk of complications associated with COVID-19, and medical documentation was not required. *Id.* ¶ 23 & Ex. L.

It is well-established that employers are entitled to seek medical documentation from employees seeking leave or any other type of accommodation due to a disability. *Boughton v. Town of Bethlehem*, No. 13-CV-01583, 2015 WL 5306077, at *14 (N.D.N.Y. Sept. 10, 2015). Contrary to Plaintiff's vague assertions that defendants scrutinized her medical documentation and sick leave requests (*Complaint*, ¶ 181) or ignored her questions (*id*, ¶ 100), the College worked closely with Plaintiff to accommodate her and calculate her accrued sick leave *Flynn Decl.*, ¶ 19 & Ex. H. Plaintiff has failed to produce any evidence that she was subjected to disparate treatment because she had a disability, and her claim must be dismissed. *Payne v.*

15298815

*Cornell Univ.*, No. 18-CV-1442, 2021 WL 39684 at *15 (N.D.N.Y. Jan. 5, 2021) (dismissing plaintiff's disability discrimination claims because her allegations were based on mere speculation and she failed to identify any similarly situated, non-disabled employees who were treated differently than her).

### B. Plaintiff Cannot Establish a Failure to Accommodate Claim.

To establish a failure to accommodate claim, Zimpfer must establish: (1) she is a qualified individual with a disability; (2) she can perform the essential functions of her job, with or without reasonable accommodation; and (3) the employer had notice of her disability and refused to make such accommodations. *Lyons v. Legal Aid Soc.*, 68 F.3d 1512, 1515 (2d Cir. 1995).

### 1. Defendants Provided Plaintiff with Reasonable Accommodations

Summary judgment dismissing a failure to accommodate claim is appropriate where the employer provided reasonable accommodations to the plaintiff. *Noll v. IBM Corp.*, 787 F.3d 89, 95 (2d Cir. 2015); *see also Payne*, 2021 WL 39684 at *18. Here, the College approved Plaintiff's request to teach some of her classes in an online format throughout the Fall 2019 academic semester and to assume a fully remote teaching arrangement in the Fall of 2020 as a result of her medical condition that placed her at greater risk of exposure during the COVID-19 pandemic. *Flynn Decl.*, ¶¶ 19, 22 & Exs. H & K); *Zimpfer Depo.*, at 160-173, 189. Defendants also provided Plaintiff with unpaid leaves of absence (*Flynn Decl.*, ¶¶ 19, 24), which constitute reasonable accommodations. *Vangas v. Montefiore Med. Ctr.*, 6 F. Supp. 3d 400, 414 (S.D.N.Y. 2014). In short, the College granted all of Plaintiff's accommodation requests from Fall 2019 until the time of her voluntary resignation. *Flynn Decl.*, ¶ 25. Indeed, Plaintiff has

22

not and cannot identify a single accommodation that Defendants refused to provide to her.

### 2. Defendants Engaged in the Interactive Process

Plaintiff claims that the College failed to engage in the "interactive process." *Complaint*, ¶¶ 18, 97, 179. The interactive process can involve "meeting with the employee who requests an accommodation, requesting information about the condition and what limitations the employee has, asking the employee what he or she specifically wants, showing some sign of having considered the employee's request, and offering and discussing available alternatives when the request is too burdensome." *Frilando v. N.Y.C. Transit Auth.*, 513 F. Supp. 3d 356, 365 (S.D.N.Y. 2021) (citing *Lovejoy-Wilson v. NOCO Motor Fuel, Inc.*, 263 F.3d 208, 218–19 (2d Cir. 2001)).

The record establishes that the College engaged in the interactive process. Beginning in September of 2019, upon learning of Plaintiff's need for adjustments to her teaching duties due to a medical condition, Flynn, Lantzky and Plaintiff's Department Chair conferred with her on numerous occasions. Defendants discussed with Plaintiff her request to move her on-campus courses to an online format and/or to take leave from some or all of her courses. *Flynn Decl.*, ¶ 10-24 & Exs. B-I, K-M); *Zimpfer Depo.*, at 164-75, 186-88. Zimpfer's distaste for the timing and content of the interactive process is not sufficient to sustain her disability discrimination claim, and it must be dismissed. *Boughton*, 2015 WL 5306077, at *14.

Accordingly, Plaintiff's Twelfth Cause of Action must be dismissed.

### POINT V: PLAINTIFF'S "AIDING AND ABETTING" CLAIMS MUST BE DISMISSED

Plaintiff alleges nine separate causes of action under theories of "aiding and abetting" gender and racial discrimination and retaliation against Brophy, Lantzky and

15298815

Flynn under the NYHRL. *Complaint*, ¶¶ 184-248. "The liability of an employer must be established as a predicate to individual liability for aiding and abetting." *Stevenson*, 2022 WL 179768, at *20. For all of the reasons discussed above, the College is not liable to Zimpfer, and accordingly, her aiding and abetting claims must be dismissed.

Assuming, *arguendo*, that any of Zimpfer's claims against the College succeed, to prove any claim for aiding and abetting discrimination or retaliation Zimpfer must show that the defendant "actually participate[d]" in such unlawful conduct by the employer. *McHenry v. Fox News Network, LLC*, 510 F. Supp. 3d 51, 68 (S.D.N.Y. 2020). Aiding and abetting "liability requires that the aider and abettor share the intent or purpose of the principal actor." *Id.* "An individual cannot aid and abet their own discriminatory conduct." *Boonmalert v. City of N.Y.*, 721 Fed. Appx. 29, 34 (2d Cir. 2018).

As discussed at the outset, Zimpfer has alleged that Brophy, Lantzky and Flynn not only "aided and abetted" discriminatory and retaliatory conduct, but that each of them, in fact, engaged in such conduct. Both cannot be true or proven. Further, as discussed above, there is no proof of discriminatory intent on the part of the College. *See, e.g.,* Part II.B, Part III. For these reasons, Plaintiff's aiding and abetting claims must be dismissed.

## CONCLUSION

Defendants' motion for summary judgment should be granted, and Plaintiff's Complaint dismissed in its entirety.

15298815

Dated:  January 16, 2023                    BOND, SCHOENECK & KING, PLLC


By:_____*s/Suzanne M. Messer*_____
       Christa R. Cook
       Suzanne M. Messer
*Attorneys for Defendants*
Office and P.O. Address
One Lincoln Center
Syracuse, New York  13202-1355
Telephone:  (315) 218-8000

15298815