UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

———————————————————

DONNA J. ZIMPFER,

                    Plaintiff,

      v.                                         Case No. 1:21-cv-00231-LJV-LGF

HILBERT COLLEGE, MICHAEL BROPHY,
PRESIDENT, KRISTINA LANTZKY-EATON,
PROVOST AND VICE PRESIDENT FOR
ACADEMIC AFFAIRS, and MAURA FLYNN,
HUMAN RESOURCES DIRECTOR,

                    Defendants.

———————————————————

## PLAINTIFF'S MEMORANDUM IN OPPOSITION TO
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

**RUPP PFALZGRAF** LLC
Attorneys for Plaintiff, Donna J. Zimpfer
Matthew D. Miller, Esq.
1600 Liberty Building
Buffalo, New York 14202
(716) 854-3400
Miller@RuppPfalzgraf.com

# TABLE OF CONTENTS

Page No.

PRELIMINARY STATEMENT ........................................................................ 1

ARGUMENT ................................................................................................. 1

POINT I

    MS. ZIMPFER WAS PAID LESS THAN HER MALE COLLEAGUES
    FOR SUBSTANTIALLY EQUAL WORK AND DEFENDANTS'
    MOTIONTHEREFORE MUST BE DENIED WITH RESPECT TO
    MS. ZIMPFER'S EQUAL PAY ACT CLAIMS ............................................ 3

    A.  Ms. Zimpfer Has Established a Prima Facie violation of the
         EPA and, thus, a Presumption of Discrimination ................................. 4

        1.  Defendants paid different wages to employees of the
            Opposite sex ....................................................................... 4

        2.  Ms. Zimpfer and her male comparators performed equal
            work on jobs requiring equal skill, effort, and responsibility ........... 5

            a.  Equal skill ................................................................. 6
            b.  Equal effort and responsibility ...................................... 9

    B.  Defendants' Asserted Affirmative "Factor Other Than Sex"
         Defense Relies on Unparticularized and Unsupported Assertions
         that Fail As A Matter of Fact and Law ................................................ 10

        1.  Defendants fail to support or particularize how any
            "factor other than sex" justified the undisputed pay disparity ......... 11

        2.  The "Faculty Salary Study" fails to establish that
            Ms. Zimpfer's lower pay was unrelated to her sex .......................... 12

    C.  Defendants' Purported Justification for Differentials
         in Pay Are Pretextual ........................................................................ 13

POINT II

    MS. ZIMPFER HAS ESTABLISHED THAT HER UNEQUAL
    PAY WAS MOTIVATED BY DISCRIMINATORY ANIMUS AND,
    THUS, HER TITLE VII AND NYHRL GENDER DISCRIMINATION
        CLAIMS MUST SURVIVE SUMMARY JUDGMENT ....................... 14

i

Page No.

POINT III

MS. ZIMPFER WAS RETALIATED AGAINST FOR
ENGAGING IN PROTECTED ACTIVITY, AND THUS,
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT SHOULD
BE DENIED WITH RESPECT TO MS. ZIMPFER'S
RETALIATION CLAIMS ................................................................. 18

    1. Defendants Subjected Ms. Zimpfer to Adverse
       Employment Actions that Were More than a
       "Mere Inconvenience" ................................................... 19

    2. There is a Clear Causal Connection Between
       Ms. Zimpfer's Complaints and Defendants' Swift and
       Pervasive Retaliatory Actions ....................................... 21

    3. Defendants' Justification is Unworthy of Credence ...... 21

POINT IV

MS. ZIMPFER'S HOSTILE WORK ENVIRONMENT MUST
SURVIVE SUMMARY JUDGMENT ............................................... 23

POINT V

MS. ZIMPFER'S AIDING & ABETTING CLAIMS MUST
SURVIVE SUMMARY JUDGMENT ............................................... 24

POINT VI

MS. ZIMPFER'S NYHRL CLAIMS AGAINST INDIVIDUAL
DEFENDANTS MUST SURVIVE SUMMARY JUDGMENT .................... 25

CONCLUSION ............................................................................. 25

## <u>TABLE OF AUTHORITIES</u>

<u>Page No.</u>

### <u>CASES</u>

*Aldrich v. Randolph Cent. Sch. Dist.*, 963 F.2d 520, 526-27 & n.1 (2d Cir. 1992)............ 3, 4

*Belfi v. Prendergast*, 191 F.3d 129, 135 (2d Cir. 1999) .................................................. 2, 3, 4, 5, 11,
15, 16, 18

*Burlington Northern & Santa Fe Ry. v. White*, 548 U.S. 53, 69 (2006) ............................ 19, 20

*Brady v. Town of Colchester*, 863 F.2d 205, 211 (2d Cir. 1988)........................................ 2

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)...................................................... 2

*Chertkova v. Connecticut Gen. Life Ins. Co.*, 92 F.3d 81, 87 (2d Cir. 1996) .................... 2

*Cifra v. GE*, 252 F.3d 205, 216 (2d Cir. 2001) .................................................................. 18

*Cronin v. Aetna Life Ins. Co.*, 46 F.3d 196, 202 (2d Cir. 1995) ........................................ 2, 15

*Dapson v. City of Rochester*,
    2019 U.S. Dist. LEXIS 22434, *30 (W.D.N.Y. February 11, 2019).............................. 23

*Doe v. Bloomberg L.P.*, 36 N.Y.3d 450, 457 (2021) ......................................................... 25

*EEOC v. Port Auth. Of N.Y. & N.J.*, 768 F.3d 247, 255 (2d Cir. 2014) ......................... 6, 9

*Engelmann v. National Broadcasting Co.*,
    1996 U.S. Dist. LEXIS 1865, *27 (S.D.N.Y. Feb. 22, 1966)......................................... 7

*Feingold v. New York*, 366 F.3d 138, 152 (2d Cir. 2004).................................................. 19, 21

*Graziadio v. Culinary Inst. of Am.*, 817 F.3d 415, 430 (2d Cir. 2016).............................. 13

*Hoffman v. St. Bonaventure Univ.*,
    2021 U.S. Dist. LEXIS 2399, *12 (W.D.N.Y. Jan. 5, 2021) .......................................... 15

*Lavin-Mceleney v. Marist College*, 239 F.3d 476, 480 (2d Cir. 2001).............................. 5, 6, 7, 8, 10

*Leibovitz v. N.Y. City Transit Auth.*, 252 F.3d 179, 188 (2d Cir. 2001) ............................ 23

*Lovejoy-Wilson v. NOCO Motor Fuel, Inc.*, 263 F.3d 208, 223 (2d Cir. 2001) ................ 18, 19, 21

iii

Page No.

*Matthew v. Tex. Comptroller of Pub. Accounts,*
   2022 U.S. Dist. LEXIS 179291, *29 (S.D.N.Y. 2022)................................... 22, 23

*McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973) ................................ 15, 18

*McHenry v. Fox News Network, LLC,* 510 F. Supp. 3d 51, 68 (S.D.N.Y. 2020) ............... 24

*Murphy v. ERA United Realty,* 251 A.D.2d 469, 472 (2d Dept. 1998) ............................ 24

*Pollis v. New Sch. for Soc. Res.,* 132 F.3d 115, 118 (2d Cir. 1997) ................................... 3

*Reeves v. Sanderson Plumbing,* 530 U.S. 133, 148 (2000) ................................ 15, 16, 18

*Ryduchowski v. Port Auth.,* 203 F.3d 135, 143 (2d Cir. 2000) ........................................... 10

*Scalera v. Electrograph Sys.,* 848 F. Supp. 2d 352, 371 (E.D.N.Y. 2012)......................... 25

*Texas Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 252-53 (1981) ............................. 15

*Tomka v. Seiler Corp.,* 66 F.3d 1295, 1310 (2d Cir. 1995)); 29 U.S.C. § 206(d)(1).......... 3, 6, 10, 11,
                                                                   15, 18

**RULES and REGULATIONS**

Fed. R. Civ. P. 56(c) ........................................................................................................ 2

29 C.F.R. § 1620.15(a)..................................................................................................... 6

29 C.F.R. § 1620.16(a)..................................................................................................... 6

29 C.F.R. § 1620.17(a)..................................................................................................... 6

**STATUTES**

New York Labor Law § 194 ............................................................................................ 3

NYSHRL § 296(1)(h) ...................................................................................................... 23

NYSHRL § 296(6)............................................................................................................ 24

NYSHRL § 300 …………………………………………………………………………..23

iv

## PRELIMINARY STATEMENT

This case stems from the deliberate, longstanding refusal of Hilbert College ("Hilbert"),
Michael Brophy ("Brophy"), Kristina Lantzky-Eaton ("Lantzky"), and Maura Flynn ("Flynn")
(collectively "Defendants") to pay Donna Zimpfer ("Ms. Zimpfer") equal pay for equal work.
Ms. Zimpfer, a skilled retired sergeant with a master's degree and a seventeen-plus year career of
corrections experience, was akin to a unicorn in the field of criminal justice academia.  Hilbert,
however, refused to recognize Ms. Zimpfer's talents for one simple reason: her sex.

Ms. Zimpfer first learned that she had received lower pay than her male colleagues in
2012, when she was told that Hilbert was raising her salary to be closer to that of her male peers.
In 2019—*fourteen years* after joining the Hilbert community—Ms. Zimpfer learned that her pay
was *still* significantly lower than that of her less-senior male colleagues.  When Ms. Zimpfer
respectfully asked Defendants to rectify the pay disparity, their response was swift and
deliberate: days after Ms. Zimpfer filed an internal complaint, Defendants disabled her email
account (and her husband's) in an unmistakable act of retribution.  Defendants then continued to
make Ms. Zimpfer's working conditions so intolerable that Ms. Zimpfer ultimately, and
reasonably, felt no choice but to leave.

As demonstrated here and in the accompanying papers, there are both substantial material
issues of fact precluding summary judgment and ample record support showing that
Ms. Zimpfer's claims are meritorious and deserve to go before a jury.

## ARGUMENT

Summary judgment is only proper if the parties' submissions "show that there is no
genuine issues as to *any* material fact and that the moving party is entitled to judgment as a

matter of law." Fed. R. Civ. P. 56(c) (emphasis added); *Celotex Corp. v. Catrett*, 477 U.S. 317,

322-23 (1986).     The moving party bears the burden of establishing that there is no genuine

disputed issue of fact, and the court must resolve all ambiguities and make all factual inferences

in favor of the non-moving party. *See, e.g., Cronin v. Aetna Life Ins. Co.*, 46 F.3d 196, 202

(2d Cir. 1995). "If, as to the issue on which summary judgment is sought, there is any evidence

in the record from any source from which a reasonable inference could be drawn in favor of the

nonmoving party, summary judgment is improper." *Id.* at 203 (citing *Brady v. Town of

Colchester*, 863 F.2d 205, 211 (2d Cir. 1988)). Courts "must be especially cautious in deciding

whether to grant this drastic provisional remedy in a discrimination case, because the employer's

intent is often at issue and careful scrutiny may reveal circumstantial evidence supporting an

inference of discrimination." *Belfi*, 191 F.3d 129 at 135 (citing *Chertkova v. Connecticut Gen.

Life Ins. Co.*, 92 F.3d 81, 87 (2d Cir. 1996)).

Defendants fail to meet their heavy burden.[1] There is copious evidence in the record to

show that Defendants not only paid Ms. Zimpfer less than her male colleagues for substantially

equal work, but that they did so with discriminatory intent. When Ms. Zimpfer learned of the

continued pay disparity and requested equal pay for equal work, Defendants swiftly retaliated

against her and made her working conditions intolerable. Defendants' claims to the contrary fail

as a matter of law and otherwise rely on disputed facts. The court should accordingly deny

Defendants' motion for summary judgment and grant Ms. Zimpfer her day in court.

---

[1] Ms. Zimpfer is no longer pursuing the second, fourth, sixth, twelfth, sixteenth, seventeenth, and
eighteenth causes of action; this Memorandum of Law will address the remaining claims.

### POINT I[2]
### MS. ZIMPFER WAS PAID LESS THAN HER MALE COLLEAGUES FOR SUBSTANTIALLY EQUAL WORK AND DEFENDANTS' MOTION THEREFORE MUST BE DENIED WITH RESPECT TO MS. ZIMPFER'S EQUAL PAY ACT CLAIMS

Ms. Zimpfer's first cause of action alleging violations of the federal Equal Pay Act ("EPA") and her seventh cause of action alleging Willful Pay Discrimination in violation of the New York Labor Law § 194[3] must survive summary judgment, because Ms. Zimpfer has established that she was paid less than her male colleagues for substantially equal work performed under similar working conditions. Defendants' asserted affirmative defense is unsupported by the record and fails to particularize how factors other than sex justified the undisputed pay disparity. Moreover, there is ample evidence in the record to show that Defendants' justifications for the difference in pay are pretext for discrimination.

"To prove a violation of the EPA, a plaintiff must first establish a *prima facie* case of discrimination by showing: 'i) the employer pays different wages to employees of the opposite sex; ii) the employees perform equal work on jobs requiring equal skill, effort, and responsibility; and iii) the jobs are performed under similar working conditions.'" *Belfi v. Prendergast*, 191 F.3d 129, 135 (2d Cir. 1999) (quoting *Tomka v. Seiler Corp.*, 66 F.3d 1295, 1310 (2d Cir. 1995)); 29 U.S.C. § 206(d)(1). Plaintiffs need not establish an employer's discriminatory intent to prove a violation of the EPA. *Id.* at 136 (citing *Pollis v. New Sch. for*

---

[2] The relevant facts and supporting citations to the record are contained in Ms. Zimpfer's Response to Defendants' Statement of Undisputed Material Facts and Counterstatement of Material Facts in Opposition to Defendants' Motion for Summary Judgment ("R. to SOMF").
[3] Ms. Zimpfer agrees with Defendants that "[a] claim under New York's Equal Pay Act (New York Labor Law § 194) is analyzed under the same standards applicable to the federal Equal Pay Act." *See* Memorandum of Law in Support of Defendants' Motion for Summary Judgment ("Def. MOL") at 3, n. 2. Thus, Ms. Zimpfer's Seventh Cause of Action must survive summary judgment for the same reasons discussed regarding the First Cause of Action.

*Soc. Res.*, 132 F.3d 115, 118 (2d Cir. 1997)).   "[A] *prima facie* showing gives rise to a presumption of discrimination." *Id.*

When a plaintiff establishes a *prima facie* case under the EPA, the defendant then has the burden to show that one of the affirmative defenses defined in the EPA justifies the wage disparity: "(i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex." *Id.* (quoting 29 U.S.C. § 206(d)(1)) (internal quotation marks omitted).  Employers who rely on the "factor other than sex" defense bear the additional burden of establishing a "legitimate business reason for implementing the gender-neutral factor that brought about the wage differential." *Id.* (citing *Aldrich v. Randolph Cent. Sch. Dist.*, 963 F.2d 520, 526-27 & n.1 (2d Cir. 1992)).  In response, the plaintiff can then produce evidence showing that the employer's reasons purportedly justifying the wage disparity are pretextual.  *Id.*

### A. Ms. Zimpfer Has Established A *Prima Facie* Violation of the EPA and, thus, a Presumption of Discrimination

Defendants paid at least four male faculty members a higher salary than Ms. Zimpfer for substantially equivalent work under similar working conditions—thus, Ms. Zimpfer has established *prima facie* showing that Defendants violated the EPA.[4]

### 1. Defendants paid different wages to employees of the opposite sex

Defendants concede that they paid Ms. Zimpfer less than multiple male full-time faculty members, yet simultaneously argue that Ms. Zimpfer cannot establish a pay disparity between

---

[4] Defendants concede for purposes of their summary judgment motion that the working conditions of Ms. Zimpfer and her comparators were similar. *See* Def. MOL at 5, n. 4.  Thus, this Memorandum of Law in Opposition will address solely the first two elements of Ms. Zimpfer's prima facie claim regarding "i) different wages to employees of the opposite sex; [and] ii) … equal work on jobs requiring equal skill, effort, and responsibility." *See Belfi*, 191 F.3d at 135.

"employees of the opposite sex." (Def. MOL at 4). This argument misconstrues the explicit language of the EPA and ignores relevant precedent.

There is uncontroverted evidence in the record to show that Ms. Zimpfer, a woman and professor in Hilbert's Criminal Justice Department, (Zimpfer Decl., ¶1), was paid less than at least two male full-time faculty members also in the Criminal Justice Department: John Culhane ("Culhane") and Mark Paoni ("Paoni"), (Def. SOMF ¶ 10). The record also shows that she was paid less than at least two other male full-time faculty members: Dan Culver,[5] (R.to SOMF ¶¶12, 15, 60, 66), and John Reinholz, ("Reinholz") (Brophy Decl., ¶19). Ms. Zimpfer has therefore plainly established that Defendants paid different wages to "employees of the opposite sex." *See* 29 U.S.C. § 206(d)(1); *see also Belfi*, 191 F.3d at 135. The fact that there were also women in the Criminal Justice Department who were paid more than Ms. Zimpfer is immaterial to the *prima facie* analysis, which does not require proof of a disparity between *all* members of each sex. *See id.*; *see also Lavin-Mceleney v. Marist College*, 239 F.3d 476, 480 (2d Cir. 2001) (finding that plaintiff-professor, a woman, identified an appropriate male comparator professor in a three-person comparison group even when the highest-paid professor of that group was also a woman).

2. **Ms. Zimpfer and her male comparators performed equal work on jobs requiring equal skill, effort, and responsibility**

Ms. Zimpfer "perform[ed] equal work on jobs requiring equal skill, effort, and responsibility" as compared to Culver, Reinholz, Culhane, and Paoni (collectively, "comparators"). *See Belfi*, 191 F.3d at 135. In arguing the contrary, Defendants misapply the standards used to evaluate whether comparators' jobs entailed equal work, which requires plaintiffs to show that the pertinent positions

---

[5] Culver was not addressed in Defendants' memorandum or related papers, (Def. MOL), and was likely an intentional omission, (Zimpfer Decl. at 1, n.2). However, Ms. Zimpfer disclosed Culver as a "comparator" at the beginning of this lawsuit. (Miller Decl., Ex. 1 at 4-5.)

are "substantially equal in skill, effort, and responsibility," rather than "identical." *See Lavin-McEleney*, 239 F.3d at 480 (citing *Tomka*, 66 F.3d at 1310).   Moreover, Defendants disregard that the issue of "[w]hether two positions are 'substantially equivalent' for Equal Pay Act purposes is a question for the jury." *See id.* (citing *Tomka*, 66 F.3d at 1311).

Compared to these four male employees, there is substantial evidence in the record to show that Ms. Zimpfer's "actual job content" entailed (i) substantially equal skill, as assessed by the job performance's requisite "experience, training, education, and ability," *see EEOC v. Port Auth. Of N.Y. & N.J.*, 768 F.3d 247, 255 (2d Cir. 2014) (citing 29 C.F.R. § 1620.15(a)), (ii) substantially equal effort, as assessed by the job performance's requisite "physical or mental exertion," *see id.* (citing 29 C.F.R. § 1620.16(a)), and (iii) substantially equal responsibilities, as assessed by the job performance's "degree of accountability," *see id.* (citing 29 C.F.R. § 1620.17(a)).

### a.  Equal skill

Ms. Zimpfer has extensive experience, training, education, and abilities directly applicable to her performance requirements and job content as a professor in the Criminal Justice Department. *See* Miller Decl., Ex. 2 at 203: 9-14 (Brophy stating that Ms. Zimpfer had the necessary talents, intangibles, and other factors necessary for the position of associate professor); (R. to SOMF ¶¶57, 58, 64).  As a professor with both corrections experience and a master's degree, Ms. Zimpfer was exceptionally unique in her field.  (Zimpfer Decl., ¶5).  Ms. Zimpfer routinely applied the varied skills and expertise she gained from her master's degree and seventeen-year corrections career to her coursework in corrections, the juvenile justice system, parole, and community-based correction. (R. to SOMF¶¶57, 58, 64). Through these skills and experiences, Ms. Zimpfer was qualified to teach each of her comparator's coursework.  (R. to SOMF ¶¶ 64, 68).

Ms. Zimpfer also had more seniority at Hilbert—and thus more on-the-job experience—than each of her comparators.[6]  Ms. Zimpfer's relative seniority at Hilbert would lead a reasonable fact-finder to conclude that her skills were *at least* equivalent, if not superior, to those of her less senior male colleagues.  *See Engelmann v. National Broadcasting Co.*, 1996 U.S. Dist. LEXIS 1865, *27 (S.D.N.Y. Feb. 22, 1966) ("An employee's past experience in a position makes him better able to do it in the future, and understandably justifies a higher salary than might be paid to a newcomer").

In their efforts to paint Ms. Zimpfer as less skilled than her higher-paid male counterparts, Defendants rely entirely on dubious comparisons and disputed facts.  For example, Defendants place great emphasis on a misleading comparison of Ms. Zimpfer's and Reinholz's years of teaching experience at the time of their respective hires.  (Def. MOL at 6).  However, recognizing that the "equal skill" analysis is a "question for the jury," *see Lavin-McEleney*, 239 F.3d at 480, any reasonable fact-finder would likely find that the pertinent inquiry to determine "experience" is the *total* amount of teaching experience at the time of the pay disparity as opposed to the time of hire. (To argue the contrary would, by way of example, result in the patently absurd conclusion that a professor who began her career at Hilbert with no prior teaching experience would, fifty years later, still be "less experienced" than a new professor with one year of experience at the time of his hire.) Ms. Zimpfer's *total* teaching experience was at least equivalent to that of Reinholz: each began teaching as adjuncts at other colleges in 2003. (R. to SOMF ¶¶ 54, 60(ii)). Ms. Zimpfer also had more total teaching experience than Culhane, who began teaching at another institution in 2008, *id.*, ¶65, Paoni, who taught at another school from 2006-2009 and joined Hilbert in 2013, *id.*, ¶66, and Culver, who had seven years of teaching experience at the time of his hire in 2013, *id.,* ¶60(i.).

---

[6] Ms. Zimpfer was hired in 2004, (Def. SOMF ¶4), Reinholz was hired in 2008, (R. to SOMF ¶60(ii)), Culver was hired in 2013, *id.*, ¶60(i), Paoni was hired in 2013, *id.*, ¶67, and Culhane was hired in 2009, *id.*, ¶65.

Defendants' emphasis on Reinholz's coursework in forensic science, (Def. MOL at 6), similarly falls flat. As an initial matter, the extent to which forensic science and criminal justice coursework were divided among recognizably separate departments at Hilbert is disputed in the record, which shows that forensics and criminal justice fell under the same umbrella within the broader Criminal Justice Department. (R. to SOMF ¶14). Even assuming *arguendo* that forensic science and criminal justice coursework were treated as separate departments, that fact alone would not render Reinholz an unsuitable comparator under the EPA. *See Lavin-Mceleney*, 239 F.3d at 481 (affirming judgment in favor of plaintiff-professor under EPA even when the plaintiff's male comparator taught in a different department within the college). Moreover, Reinholz had no experience studying forensics at the time of his hire at Hilbert. (R. to SOMF ¶62). Thus, teaching forensics did not involve more skill *as a matter of law* than what Ms. Zimpfer possessed.

Defendants also point to Culhane's juris doctorate ("JD") and Paoni's doctorate degree to argue that they were more skilled than Ms. Zimpfer.[7] However, the applicability of terminal degrees to the job content of full-time faculty at Hilbert College—particularly in the Criminal Justice Department—is disputed in the record, which shows that, at most, degrees "maybe" affected salaries. (R. to SOMF ¶71). In fact, Lantzky has stated that there was no preference at all for PhD candidates when hiring in the Criminal Justice Department. *Id.* Further, still recognizing that the question of "equal skill" is one for the jury, *see Lavin-McEleney*, 239 F.3d at 480, a reasonable fact-finder could find that Ms. Zimpfer's master's degree in Criminal Justice, coupled with her unique experience in

---

[7] Defendants even strain to argue that Reinholz, who, like Ms. Zimpfer, had a Master's degree, (R. to SOMF, ¶24), was nonetheless more skilled as a matter of law based on his alleged completion of "some requirements toward his Ph.D.,"(Def. MOL at 6)—a particularly questionable claim given that Reinholz's resume suggests that he took some courses in 2011-2012 in a Doctor of Philosophy program before appearing to drop out of the same, (R. to SOMF ¶24).

the field, was equivalent or superior to that of a JD or doctorate—particularly when there is nothing to suggest that the degrees of Culhane or Paoni involved specialized coursework in the criminal justice field. (R. to SOMF ¶69).

With respect to Culver's skills, Defendants likely intentionally excluded them from their analysis, (Zimp. Decl., ¶17, n.2), since not only did he have a master's degree like Ms. Zimpfer, but he was also a lower rank as of 2019, (R. to SOMF ¶¶12(ii)-(iii), 61). Although he taught forensic science coursework, his studies and work experience before joining Hilbert were not grounded in forensics, (R. to SOMF ¶61), and Ms. Zimpfer was qualified to teach his forensics courses, *id.,* ¶64.

Thus, evaluating the evidence in the light most favorable to Ms. Zimpfer with an eye toward the specific performance requirements of her job, Ms. Zimpfer's skill level was at least equal if not superior to that of her four higher-paid male comparators.

**b.  Equal effort and responsibility**

There is abundant evidence in the record to show that Ms. Zimpfer's job performance required substantially equal mental exertion and accountability to that of her comparators, thus satisfying a *prima facie* showing of equal effort and responsibility. *See Port Auth.*, 768 F.3d at 255. Defendants concede that "full-time faculty members were required to teach the same course load" irrespective of title. (Def. MOL at 7, n. 5). Defendants nonetheless argue, and Ms. Zimpfer does not dispute, that Culhane and Paoni held responsibilities at Hilbert in addition to their coursework. However, Ms. Zimpfer also assumed extensive additional responsibilities beyond her teaching duties, (R. to SOMF ¶59), equal to or exceeding those of Paoni and Culhane.[8]

---

[8] Reinholz assumed no additional responsibilities outside of teaching whatsoever, (R. to SOMF ¶62), and thus Ms. Zimpfer's job performance necessarily required more effort and responsibility than his.

Ms. Zimpfer is not required to show that the additional responsibilities were "identical" to those assumed by her comparators, and Defendants have failed to establish, as a matter of law, that the additional responsibilities outside of coursework assumed by Culhane and Paoni necessitated more "mental exertion" or "accountability" than those assumed by Ms. Zimpfer. *See Lavin-Mceleney*, 239 F.3d at 480. In fact, the record is devoid of the degree of mental exertion or accountability necessary for the additional responsibilities of Culhane and Paoni, while Ms. Zimpfer can establish that those she assumed required substantial time and effort. (R. to SOMF ¶59).

Thus, there is ample evidence to establish that Ms. Zimpfer's actual job content and performance required equal skill, effort, and responsibility to those of her male comparators. Ms. Zimpfer has therefore established a *prima facie* case under the EPA that should go before a jury.

**B. Defendants' Asserted Affirmative "Factor Other Than Sex" Defense Relies on Unparticularized and Unsupported Assertions that Fail As A Matter of Fact and Law**

Defendants have failed to meet their "heavy" burden of establishing that one of the affirmative defenses defined in the EPA justifies the wage disparity between Ms. Zimpfer and her higher-paid male comparators. *See Ryduchowski v. Port Auth.*, 203 F.3d 135, 143 (2d Cir. 2000) ("The burden of establishing one of the four affirmative defenses is a heavy one, because the statutory exemptions are narrowly construed.") (internal citations and quotation marks omitted).

Defendants assert the "factor other than sex" affirmative defense. (Def. MOL at 6). When an employer relies on a factor other than sex to justify a pay disparity, the employer has "the burden of persuasion to show both that it based … [the] higher salary on this factor and that … [the factor] is a job-related qualification for the position question." *See Tomka*, 66 F.3d at 1312 (citing *Aldrich*, 963 F.2d at 527). Defendants fail to do so—instead, they rely on vague claims about the "multitude of factors" causing salary disparities and a flawed "Faculty Salary Study." (Def. MOL at 7-9).

1.  **Defendants fail to support or particularize how any "factor other than sex" justified the undisputed pay disparity**

Defendants claim that Ms. Zimpfer's lower salary was not caused by her gender; instead, they allege vaguely that "[d]ifferences in faculty salaries can be caused by a multitude of factors, including when individuals are hired, individual skills, the possession of or lack of terminal degrees, experience and qualifications, market demand and salary compression." (Def. MOL at 7). Defendants argue broadly that "such factors influenced the compensation of the three male professors that Zimpfer alleges were paid more than [she]," adding that Ms. Zimpfer's comparators also "negotiated higher salaries than Zimpfer at the time of their hire." *See id.*

The court should disregard Defendants' disputed and unparticularized claims. In *Tomka*, 66 F.3d at 1312, the court evaluated an employer's "factor other than sex" defense where the employer "claim[ed] to consider a 'variety of factors' in determining … salaries … including experience, education, work and salary history." *Id.* The court found that because the employer failed to state with particularity how those factors impacted the wage difference between plaintiff and three of her male comparators, the employer's defense failed. *Id.* Here, as in *Tomka*, Defendants' "mere assertion" that a multitude of factors unrelated to sex caused the pay disparity between Ms. Zimpfer and her male colleagues is insufficient to meet Defendants' heavy burden of particularizing how those factors explain the salary discrepancy and how those factors are job-related to the positions in question. *See id.* At most, Defendants' unsupported and nonspecific claims "merely raise[] a fact issue as to whether all or any of these factors can explain and justify the wage differentials" between Ms. Zimpfer and her male comparators. *Id.* Further, Defendants have also failed to put forth a "legitimate business reason" justifying the "multitude of factors" that allegedly caused the disparate salary between Ms. Zimpfer and her higher-paid male colleagues. *See Belfi*, 191 F.3d at 136.

11

Defendants also rely on disputed facts to support their justification for the pay disparity. Although Brophy asserts that Hilbert "places a significant value on terminal degrees" to justify Culhane and Paoni's higher salaries, (Brophy Decl., ¶15), that claim is contradicted by Lantzky and Flynn, (R. to SOMF, ¶71). The contention that Defendants valued years of teaching experience at hire is also disputed. *Id.* ¶72. Thus, Defendants' vague defense fails to justify the pay disparity.

### 2. The "Faculty Salary Study" fails to establish that Ms. Zimpfer's lower pay was unrelated to her sex

The "Faculty Salary Study" conducted by Welch Consulting ("Welch") is fatally flawed and fails to justify the wage disparity between Ms. Zimpfer and her comparators. As an initial matter, the findings of the study are unreliable due to their reliance on a small sample size. (Massey Decl., ¶13). Thus, its findings cannot establish *as a matter of law* that sex did not cause Ms. Zimpfer's lower pay.

Further, the study relies on misleading data regarding Ms. Zimpfer's salary and years of experience. Following Ms. Zimpfer's 2019 salary complaints, on November 20, 2020, Ms. Zimpfer received a $4,000 raise. (R. to SOMF, ¶12). Ms. Zimpfer was either the only Hilbert employee or one of very few Hilbert employees to receive this raise. *Id.* Welch used Ms. Zimpfer's heightened salary for its study, (*id.,* ¶12(iv)), with the effect of lessening the salary discrepancy between Ms. Zimpfer and her male comparators. Welch also relied on Ms. Zimpfer's years of teaching experience at hire (one) as opposed to years of experience at the time of the pay disparity. *Id.*, ¶76.

Significantly, even using a small sample size, Ms. Zimpfer's years of experience at hire and a heightened salary for their analysis, **Welch nonetheless advised Defendants to raise Ms. Zimpfer's salary at the conclusion of their gender-based study**. (Miller Decl., Ex. 2 at 162: 5-15). Simply put, this study fails to show that Ms. Zimpfer's lower salary was unrelated to her sex, and in reality, is an outright admission that, even after this study, Ms. Zimpfer needed yet another raise.

Defendants' affirmative defense accordingly cannot justify Ms. Zimpfer's lower salary.

## C. Defendants' Purported Justification for Differentials in Pay Are Pretextual

There is abundant evidence in the record to establish that Defendants' purported justifications for Ms. Zimpfer's lower pay are pretext for discrimination.  "[W]eaknesses, implausibilities, inconsistencies, or contradictions" are all evidence jurors can rely on to conclude that an employer's reasoning for its actions are pretext for discrimination.  *See Graziadio v. Culinary Inst. of Am.*, 817 F.3d 415, 430 (2d Cir. 2016).

The record shows that Defendants simply cannot keep their story straight regarding the reasons for the pay disparity between Ms. Zimpfer and her male colleagues.  When Ms. Zimpfer initially met with Brophy in June 2019 to discuss the pay disparity, Brophy told Ms. Zimpfer that the discrepancy was attributable at least in part to the fact that Ms. Zimpfer had a previous career outside academia. (R. to SOMF, ¶73).  Defendants' justification for the pay disparity then evolved, involving, among other claims, disputed reliance on Ms. Zimpfer's comparators' doctorate degrees. *See, e.g.,* Brophy Dec., ¶15.  Now, Defendants specifically claim—for the first time, in their summary judgment motion and related materials—that each male comparator (with the exception of Culver, whom they ignore) negotiated a higher salary than Ms. Zimpfer.[9] *Id..,* ¶¶15, 19.  Defendants' inconsistent and contradictory justifications are strong evidence of pretext.  *See Graziado*, 817 at 430.

To the extent that Defendants rely on the flawed Faculty Salary Study to justify paying Ms. Zimpfer a lower salary than her male peers, the record is also replete with their inconsistent claims.  For example, Brophy states in his declaration that, after meeting with Ms. Zimpfer on June 5, 2019 to discuss "the issue of gender disparity in salaries," he told Ms. Zimpfer that he

---

[9] The court should further disregard the claim that Ms. Zimpfer's comparators negotiated higher salaries than Ms. Zimpfer, because Brophy has no personal knowledge of these purported negotiations (if they occurred at all), as Brophy began working at Hilbert in 2019, after each comparator was hired. *See Brophy Dec.,* ¶¶6, 15, 19.

13

intended "to conduct a salary study...to determine what, if anything, could be done to address the concerns." (Brophy Decl., ¶23-24).   When previously deposed, Brophy unequivocally denied discussing pay discrepancies between male and female professors during that meeting. (R. to SOMF, ¶74(ii)).

Brophy also denied the connection between Ms. Zimpfer's gender complaint and the Faculty Salary Study, claiming that he requested the study for reasons entirely unrelated to gender—just because "[i]t was just the right thing to do." (R. to SOMF, ¶74(iii)). When questioned further, Brophy stated that his goal was to study salary compression. *Id.*, ¶74(iv). Brophy then implausibly claimed that he only made the decision to include gender in the study to "review those things that we could put our hands on easily," *id.*, a claim that is explicitly contracted by the Welch consultant that conducted that very study, (Massey Decl., ¶ 7) (stating that Welch was retained by Hilbert for the specific purpose of determining whether there were pay disparities between male and female faculty members).   These implausible denials are strong evidence that "salary compression" and Defendants' additional inconsistent justifications for the pay disparity are pretextual.

Ms. Zimpfer has established that she was paid less than her male colleagues for substantially equal work performed under similar working conditions. Defendants fail to support or particularize how factors other than sex justified the undisputed pay disparity.  Moreover, there is ample evidence in the record to show that Defendants' inconsistent, implausible, and contradictory justifications for the difference in pay are pretextual.  Ms. Zimpfer's claims must go to a jury.

## POINT II
### MS. ZIMPFER HAS ESTABLISHED THAT HER UNEQUAL PAY WAS MOTIVATED BY DISCRIMINATORY ANIMUS AND, THUS, HER TITLE VII AND NYHRL GENDER DISCRIMINATION CLAIMS MUST SURVIVE SUMMARY JUDGMENT

In evaluating a claim under Title VII, [10] courts should apply the burden-shifting standard

established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), where

> plaintiff has the burden of proving by a preponderance of the evidence a prima facie
> case of discrimination. Second, if the plaintiff succeeds in proving the prima facie
> case, the burden shifts to the defendant "to articulate some legitimate,
> nondiscriminatory reason" for [the action]. Third, should the defendant carry this
> burden, the plaintiff must then have an opportunity to prove by a preponderance of
> the evidence that the legitimate reasons offered by the defendant were not its true
> reasons, but were a pretext for discrimination.

*Texas Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 252-53 (1981) (citing *McDonnell

Douglas*, 411 U.S. at 802-804).

"A claim of unequal pay for equal work under Title VII ... is generally analyzed under

the same standards used in an EPA claim." *See Tomka* , 66 F.3d at 1312. Under Title VII, in

addition to showing membership in a protected class and disparate pay for substantially equal

work, plaintiffs must "produce evidence of discriminatory animus." *See Belfi*, 191 F.3d at 139.

To defeat summary judgment, however, "the plaintiff is not required to show that the employer's

proffered reasons were false or played no role in the employment decision, but only that they

were not the only reasons and that the prohibited factor was at least one of the 'motivating'

factors." *Cronin*, 46 F.3d at 203.

The Supreme Court has stated that "a plaintiff's prima facie case, combined with

sufficient evidence to find that the employer's asserted justification is false, may permit the trier

of fact to conclude that the employer unlawfully discriminated." *Reeves v. Sanderson Plumbing,*

---

[10] Ms. Zimpfer agrees with Defendants' assertion that "New York State Human Rights Law has
the same burden of proof and burden shifting from *McDonnell Douglas*...for Title VII claims."
*See Def. MOL* at p. 10, n. 7 (quoting *Hoffman v. St. Bonaventure Univ.*, 2021 U.S. Dist. LEXIS
2399, *12 (W.D.N.Y. Jan. 5, 2021)).  Thus, Ms. Zimpfer's Ninth Cause of Action must survive
summary judgment based on the same reasoning and legal authority discussed with respect to the
Third Cause of Action.

530 U.S. 133, 148 (2000). Thus, a fact-finder can "reasonably infer from the falsity of [an

employer's] explanation that the employer is dissembling to cover up a discriminatory purpose."

*Id.* at 147.

Ms. Zimpfer has put forth substantial evidence outlined in Point I establishing a *prima*

*facie* case of unequal pay for equal work, a burden which, in an employment discrimination case,

is "minimal" to survive summary judgment. *See Belfi*, 191 F.3d at 139.  Ms. Zimpfer also

established that Defendants' purported justification for the pay disparity was rife with blatant

contradictions and denials and thus pretextual.  Having discounted Defendants' "false

justification[s]" and revealed patent misrepresentations regarding the pay disparity, Ms. Zimpfer

has already established that intentional "discrimination … [was] the most likely alternative

explanation." *See Reeves*, 530 U.S. at 147.

However, there is ample additional evidence of intentional discriminatory animus in the

record to further show that Ms. Zimpfer's sex was a motivating factor in Defendants'

discriminatory actions. During Ms. Zimpfer's June 5, 2019 meeting with Brophy regarding her

salary, she disclosed that her salary had previously been raised by Hilbert in 2012 due to a

recognition that she was not earning as much as her male counterparts, a fact that she iterated in

her subsequent e-mail to him (courtesy-copying Flynn). (R. to SOMF, ¶80).[11] Both Flynn and

Lantzky was courtesy-copied on Brophy's threatening response on the same email thread.

(Brophy Decl., Ex. F. (Doc. 34-12 at 2)). Thus, in June 2019, Defendants were aware of Hilbert's

longstanding history of paying Ms. Zimpfer disparate pay for equal work. *See id.* Nonetheless,

---

[11] Although Brophy attempts to shirk responsibility for that disparate treatment by stating that "this was well before [his] tenure at the College," (Brophy Decl., ¶22),  he does not deny, and Defendants offer nothing to contradict, that the 2012 salary adjustment was based on disparity of pay between Ms. Zimpfer and her male colleagues, *see id.*

when Ms. Zimpfer confronted Defendants about the continued pay disparity, Defendants failed to rectify it—instead, the record shows that they engaged in a deliberate attempt to perpetuate and justify their discriminatory practices toward Ms. Zimpfer.

A reasonable fact-finder could find from the record that Defendants intentionally singled out Ms. Zimpfer to receive a raise on November 20, 2020 before the gender-based salary study in an effort to justify and "cover up" their discriminatory actions toward her.  When questioned on why Ms. Zimpfer received this specific raise, Brophy has offered inconsistent explanations, claiming both that Ms. Zimpfer was the only person to receive a raise around this time and later stating that he "couldn't tell you that no one else got a significant raise that fall" but that it was not "scores of people." (R. to SOMF, ¶12(i)) .  Significantly, Ms. Zimpfer's salary was still lower than three of the four comparators even after the November 20, 2020 raise. (Massey Decl., Ex. B (Doc. 34-37 at 8)). Further, given the demonstrably misleading nature of using Ms. Zimpfer's years of experience *at hire* in the Faculty Salary Study, *see id.*—a data point that does not have the same misleading impact on her comparators since each had more teaching experience at hire yet less *total* teaching experience than Ms. Zimpfer—a fact-finder would likely find that Defendants intentionally skewed the data to falsely suggest that Ms. Zimpfer had less teaching experience than her male comparators.

The record also establishes that Defendants intentionally asked Welch to perform a second salary study to eliminate an initial finding of disparate pay between sexes.  At the conclusion of Welch's first Faculty Salary Study, Welch found that tests run by "rank" revealed a statistically significant pay disparity between male and female Assistant Professors. *Id..*, ¶¶10, 13, 14. After Welch provided those results to Hilbert, Defendants asked Welch to "re-run the … analysis" and **instructed Welch not to control for the rank.** *See id.*, ¶15. Thus, Defendants effectively requested a "do-over," instructing Welch to exclude the very factor that led to a finding of disparate pay.

17

Ms. Zimpfer's significant salary increase shortly before the Faculty Salary Study (raised closer, yet not equivalent to, three of the four of her male comparators), Brophy's dissembling regarding the same, Defendants' intentional use of misleading data regarding Ms. Zimper's teaching experience, and Defendants' obvious attempt to cover up findings of sex-based disparate pay all show that Defendants were engaged in deliberate, intentional efforts to perpetuate and justify their longstanding discriminatory practice of paying Ms. Zimpfer unequal pay for equal work. Ms. Zimpfer has therefore established not only that Defendants paid her less than her male colleagues for substantially equal work, but that they did so with intentional discriminatory animus. *See Reeves*, 530 U.S. at 148; *see also Belfi*, 191 F.3d at 139.  Her gender discrimination claims under Title VII and the NYSHRL must survive summary judgment and go before a jury.

### POINT III
### MS. ZIMPFER WAS RETALIATED AGAINST FOR ENGAGING IN PROTECTED ACTIVITY, AND THUS, DEFENDANTS' MOTION FOR SUMMARY JUDGMENT SHOULD BE DENIED WITH RESPECT TO MS. ZIMPFER'S RETALIATION CLAIMS

Ms. Zimpfer agrees with Defendants that the same burden shifting analysis applicable to discrimination claims—namely, the *McDonnell-Douglas* framework outlined in Point II above applies to retaliation claims under Title VII and the NYSHRL.  (Def. MOL at 16). Thus, a plaintiff must first show a *prima facie* case of retaliation: namely, 1) evidence that she has engaged in protected activity, 2) that the protected activity was known to the employer, 3) the employer took adverse action against the plaintiff, and 3) that a "causal connection exists between the protected activity and the adverse action, i.e., that a retaliatory motive played a part in the adverse employment action." *See Lovejoy-Wilson v. NOCO Motor Fuel, Inc*., 263 F.3d 208, 223 (2d Cir. 2001) (citing *Cifra v. GE*, 252 F.3d 205, 216 (2d Cir. 2001)).  Once a plaintiff meets this burden, the employer must then "articulate a legitimate nondiscriminatory reason for its actions." *Tomka*, 66 F.3d at 1308.  Assuming the employer meets its burden of production,

18

the plaintiff can then show that the employer's reason was "merely a pretext for retaliation and that the employer's action was prompted by an impermissible motive." *Id.*

Defendants do not appear to contest that Ms. Zimpfer engaged in protected activity that was known to Defendants at the time, (Def. MOL at 14-18), thus satisfying the first two elements of her *prima facie* case, *see Lovejoy-Wilson*, 263 F. 3d at 223. Instead, they argue that the suspension of Ms. Zimpfer's email account was not an adverse employment action, and that there was no causal connection between Ms. Zimpfer's gender discrimination complaint and the suspension of her email account. Defendants' arguments fail, and the court should therefore deny their summary judgment motion regarding Ms. Zimpfer's retaliation claims.

### 1. Defendants Subjected Ms. Zimpfer to Adverse Employment Actions that Were More than a "Mere Inconvenience"

There is ample evidence in the record to show that Defendants' actions, taken as a whole, were "materially adverse" because they were "more disruptive than a mere inconvenience," a finding that involves evaluating "indices … unique to a particular situation." *See Feingold v. New York,* 366 F.3d 138, 152 (2d Cir. 2004) (internal citations and quotation marks omitted); *see also Burlington Northern & Santa Fe Ry. v. White*, 548 U.S. 53, 69 (2006). An employer's action is "materially adverse" when it may "dissuade[] a reasonable worker from making or supporting a charge of discrimination." *Burlington*, 548 U.S. at 68 (internal citations and quotation marks omitted) (discussing Title VII's antiretaliation provision).

The record is clear that after Ms. Zimpfer met with Brophy on June 5, 2019 to discuss her salary concerns and sent him a follow-up email regarding the same, Brophy emailed Ms. Zimpfer in response, courtesy-copying Flynn and Lantzky, stating, "I am sure you know what will happen if you don't return the contract, but that's a decision only you can make." (R. to SOMF ¶80). On September 6, 2019, Ms. Zimpfer submitted an internal complaint of sex discrimination in which

she referenced Brophy's June 5 email. *Id.*, ¶81. **Under a week later**, on September 12, Defendants disabled Ms. Zimpfer's Hilbert email account. (R. to SOMF ¶35).

As an initial matter, the claim that Ms. Zimpfer's email was only "temporarily" affected and "restored later the same day it had been … suspended," (Def. SOMF ¶ 37), is disputed, (R. to SOMF ¶37). Even assuming, *arguendo,* that a multiple-day interruption of one's workplace communication platform is a "mere inconvenience" as a matter of law (it is not), the pertinent inquiry is whether the "particular circumstances" surrounding the suspension of Ms. Zimpfer's email account would "dissuade[e] a reasonable worker from making or supporting a charge of discrimination." *See Burlington*, 548 U.S. at 68-69. The record is clear that it would.

The connection between Ms. Zimpfer's protected activity—which involved an email exchange between her and Brophy in which both Flynn and Lantzky were courtesy-copied—and the swift collective response from Brophy, Flynn, and Lantzky to suspend her email account was clear. In fact, Ms. Zimpfer immediately concluded that Defendants were acting to "get rid of" Brophy's email. (R. to SOMF ¶82). Any reasonable worker would also believe from these circumstances that their protected activity prompted swift retribution and surveillance from their employer, with the effect of dissuading that worker from making or supporting a charge of discrimination. *See Burlington*, 548 U.S. at 68-69. Thus, the record shows that the multiple-day suspension of Ms. Zimpfer's email account was an adverse employment action. *See id.*

Moreover, Defendants' retaliatory actions against Ms. Zimfper extended past their swift and deliberate disabling of her workplace email. After Ms. Zimpfer complained of unequal pay based on her sex, Defendants treated her with hostility and delay during attempts to coordinate accommodations needed for medical issues stemming from Defendants' discriminatory and retaliatory behavior. (R. to SOMF ¶¶87, 88, 89). Although Defendants dispute that Ms. Zimpfer

was "banned" from campus, (Def. MOL at 20), October 2019 emails between Flynn and

Ms. Zimpfer demonstrate that Flynn failed to correct and thus actively contributed to

Ms. Zimpfer's stated understanding that she had been banned, (R. to SOMF ¶43).

Thus, Defendants subjected Ms. Zimpfer to adverse employment actions after she

engaged in protected activity.

### 2. There is a Clear Causal Connection Between Ms. Zimpfer's Complaints and Defendants' Swift and Pervasive Retaliatory Actions

The temporal proximity between Ms. Zimpfer's internal complaint of discrimination and

the disabling of her email account alone should be sufficient to establish a causal connection

between the two, as causality "can be established indirectly by showing that the protected

activity was closely followed in time by the adverse action." *See Lovejoy-Wilson*, 263 F.3d at

224 (citations omitted). There is also ample evidence in the record to support an inference that

Defendants' subsequent and pervasive hostile treatment toward Ms. Zimpfer was caused by

Ms. Zimpfer's protected complaints of unequal pay. (R. to SOMF, ¶¶87, 88, 89).

To the extent that Defendants contend that the alleged "suspicious activity" on

Ms. Zimpfer's Blackboard account was an intervening event preventing an inference of

discrimination from the close temporal proximity, (Def. MOL at 18.), that argument relies solely

on "what is factually in dispute in this case, and hence cannot be decided at summary judgment."

*See Feingold*, 366 F.3d at 156-57 (rejecting an "intervening event" argument that relied on the

presumption of issues that were factually disputed). Those disputed facts will be discussed

below in support of Ms. Zimpfer's showing of pretext.

### 3. Defendants' Justification is Unworthy of Credence

Defendants' claim that "suspicious activity" on Ms. Zimpfer's Blackboard account

justified disabling her email account is disputed and demonstrably implausible.

21

The record shows that four employees' email accounts were affected on September 12, 2019: Ms. Zimpfer, her husband Randy Zimpfer, Angela Grann ("Grann"), and Jenna Dulak ("Dulak"). (Miller Decl., Ex. 4 at 111: 20-23). Despite Defendants' claims to the contrary, the record shows that this was far from a random selection of employees—each was on Defendants' "blacklist." (R. to SOMF, ¶84). In fact, according to Matthew Holmes ("Holmes"), then-Network Administrator at Hilbert, it was rare to disable an email account by itself, and it was typically only done when an employee "end[s] up leaving on a bad note." (R. to SOMF, ¶33(ii)).

Defendants also simply cannot keep their story straight regarding the purported "suspicious activity" on Ms. Zimpfer's Blackboard account and surrounding events. When questioned about the same, Brophy claimed preposterously that he "came to find out" that Dulak was at the Zimpfers' home "breaking into the Blackboard system." (R. to SOMF, ¶33(i)). He further claimed that once he learned that Ms. Zimpfer and her husband were not "in danger," they (Defendants) "turned [the emails] back on." *Id.* This justification is implausible on its face and directly contradicted in the record: while Brophy has claimed that he asked Holmes to investigate the incident and that the results of Holmes's investigation revealed the break-in by Dulak, (R. to SOMF, ¶86(i)), Holmes has stated unequivocally that he was not involved in any investigation into Ms. Zimpfer's Blackboard account and never found out firsthand the results of any investigation by Hilbert into the same, *id.*, ¶86(ii).

Any reasonable fact-finder would conclude that absent a discriminatory or retaliatory motive, Defendants would not need to dissemble and concoct elaborate and patently absurd justifications for their actions. Ms. Zimpfer has copious record support to show that she engaged in protected activity known to Defendants and that they responded with swift and pervasive adverse employment actions. Her retaliation claims must survive summary judgment.

**POINT IV**
**MS. ZIMPFER'S HOSTILE WORK ENVIRONMENT MUST**
**SURVIVE SUMMARY JUDGMENT**

Ms. Zimpfer has established through the evidence discussed above that Defendants subjected

her to an environment "permeated with discriminatory intimidation" that was severe and pervasive.

*See Leibovitz v. N.Y. City Transit Auth.*, 252 F.3d 179, 188 (2d Cir. 2001)).  Moreover, under the

NYSHRL, plaintiffs need not show that the conduct at issue is "severe or pervasive"—rather, they

must establish "inferior terms, conditions or privileges of employment." *Matthew v. Tex.*

*Comptroller of Pub. Accounts*, 2022 U.S. Dist. LEXIS 179291, *29 (S.D.N.Y. 2022) (quoting

NYSHRL § 296(1)(h)).  The law must be "construed 'liberally for the accomplishment of [its]

remedial purpose.'" *Id.* (quoting NYSHRL § 300).  Ms. Zimpfer has established a hostile work

environment claim under both federal law and NYSHRL's more liberal standard.

When Ms. Zimpfer sought to address a **continued** gender-based salary disparity in June 2019,

Defendants responded with a hostile threat to return her contract "or else." (*See* R. to SOMF, ¶80).

Then, when Ms. Zimpfer took her concerns to the Title IX office, Defendants swiftly disabled her

email account—another intimidating message that she should keep her mouth shut "or else." *See id.*,

¶82.  Ms. Zimpfer was forced to take leave and work from home to cope with anxiety and other

ailments she experienced due to Defendants' actions. *See id.*, ¶¶28, 29, 87, 88, 89.

Defendants' argument that Ms. Zimpfer cannot pursue both a hostile work environment and

retaliation claim fails. Ms. Zimpfer is not alleging that Defendants' sole "motivation in creating the

… hostile work environment was to retaliate against" Ms. Zimpfer. *See Dapson v. City of Rochester*,

2019 U.S. Dist. LEXIS 22434, *30 (W.D.N.Y. February 11, 2019). Rather, the hostile work

environment began in June 2019 with a thinly veiled, intimidating threat and permeated her work

23

experience thereafter.  Although some of the factual support for Ms. Zimpfer's retaliation claim and hostile work environment claim overlap, the causes of action are distinct.

## POINT V
### MS. ZIMPFER's AIDING & ABETTING CLAIMS MUST SURVIVE SUMMARY JUDGMENT

Under NYSHRL § 296(6), when an employer participates in a proscribed discriminatory practice, this "serves as the predicate for the imposition of liability on others for aiding and abetting." *Murphy v. ERA United Realty*, 251 A.D.2d 469, 472 (2d Dept. 1998).  Defendants mischaracterize Ms. Zimpfer's allegations as claiming merely that Brophy, Lantzky, and Flynn aided *their own* violations.  (*See.* Def. MOL at 23-24).  Instead, as discussed above in Parts I-IV, the record shows that Hilbert independently failed to pay Ms. Zimpfer equal pay for equal work with discriminatory animus based on her sex.  Brophy, Lantzky, and Flynn aided and abetted that ongoing gender discrimination because, despite their knowledge of the same, they took no steps to remediate the intentional pattern of unequal pay.

Brophy, Lantzky, and Flynn also *independently* discriminated and retaliated against Ms. Zimpfer: each took active steps to perpetuate and justify Hilbert's unequal pay of Ms. Zimpfer by collectively threatening to fire her if she did not return her contract.[12] *See McHenry v. Fox News Network, LLC*, 510 F. Supp. 3d 51, 68 (S.D.N.Y. 2020).  They further collaborated to disable her email in response to her complaints.  Flynn then independently continued to subject Ms. Zimpfer to a hostile work environment; Lantzky and Brophy continued to fail to raise Ms. Zimpfer's salary; and Brophy, Flynn, and Lantzky collaborated with Hilbert to "cover up" and justify their discriminatory practices through a flawed salary study.

---

[12] Although Brophy wrote the June 5 email, Lantzky and Flynn were courtesy-copied and conveyed through their silence that they would support Brophy's threat.  (R. to SOMF, ¶29).

## POINT VI
## MS. ZIMPFER'S NYHRL CLAIMS AGAINST INDIVIDUAL DEFENDANTS MUST SURVIVE SUMMARY JUDGMENT

Individual civil liability under the NYSHRL can be established when "the employer…has the power to hire and fire the plaintiff." *Scalera v. Electrograph Sys.*, 848 F. Supp. 2d 352, 371 (E.D.N.Y. 2012).   Defendants' claim that the NYSHRL "does not render employees liable as individual employers," (Def. MOL at 2), fails, since Brophy, as President, and Lantzky, as Provost, would have had the power to hire and fire Ms. Zimpfer, *see* Miller Decl., Ex. 2 at 21-22 (Brophy discussing Brophy and Lantzky's involvement in hiring); *see also* Miller Decl., Ex. 4.at 45: 8-17 (Holmes discussing Lantzky's attempts to get Grann fired).   Defendants' claim that corporate employees do not qualify as employers is inapposite since Brophy, Lantzky, and Flynn are not corporate employees. *See Doe v. Bloomberg L.P.*, 36 N.Y.3d 450, 457 (2021).

## CONCLUSION

Defendants deliberately, and with animus, paid Ms. Zimpfer less than her male colleagues for equal work because of her sex.   When she spoke out, Defendants responded with unmistakable retribution. Ms. Zimpfer's claims are meritorious and must go before a jury.

Dated: March 6, 2023
      Buffalo, New York

                    Respectfully Submitted,

                    **RUPP PFALZGRAF** LLC
                    Attorneys for Plaintiff, Donna J. Zimpfer

              By:_____
                    Matthew D. Miller, Esq.
                    1600 Liberty Building
                    Buffalo, New York 14202
                    (716) 854-3400
                    Miller@RuppPfalzgraf.com