UNITED STATES DISTRICT COURT
FOR THE
WESTERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| DONNA J. ZIMPFER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:21-cv-231 |
| | ) | |
| HILBERT COLLEGE, MICHAEL | ) | |
| BROPHY, President, KRISTINA | ) | |
| LANTZKY-EATON, Provost and Vice | ) | |
| President for Academic Affairs, and | ) | |
| MAURA FLYNN, Human Resources | ) | |
| Director, | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER ON MOTION FOR SUMMARY JUDGMENT**
**(Doc. 34)**

Plaintiff Donna J. Zimpfer sues her former employer, Hilbert College ("Hilbert" or the "College"), and the above-captioned Hilbert personnel alleging "intentional and unlawful conduct in providing Professor Zimpfer, a Native American female, with unequal pay as compared to her Caucasian and male counterparts." (Doc. 1 ¶ 1.) The 21 causes of action in the Complaint include claims of gender discrimination, race discrimination, retaliation, hostile work environment, disability discrimination, and aiding-and-abetting claims. Defendants' Motion for Summary Judgment (Doc. 34) is currently pending before the court. The court heard argument on the motion on May 13, 2025.

## Background

The following facts are undisputed except where noted. Additional undisputed facts are set forth as necessary in the analysis below.

Hilbert College is an institution of higher education that embraces its Catholic Franciscan heritage. It is a four-year liberal arts college located in Hamburg, New York. It offers associate, bachelor, and master's degree programs both on campus and through online education. (Doc. 34-6 ¶ 4.)

In or around January 2019, Michael S. Brophy, Ph.D., became President of the College. (*Id.* ¶ 6.) The College hired Kristina Lantzky-Eaton, Ph.D., on or about July 1, 2016, as Interim Provost. Dr. Lantzky-Eaton was hired as Provost effective July 1, 2017, and she served in that position until January 2020. Her employment with the College ended in August 2020. (Doc. 34-18 ¶ 4.)

Donna Zimpfer completed a bachelor's degree in criminal justice at Hilbert College in 1999, and she completed a master's degree in criminal justice in 2005. (Doc. 34-7 at 2.) She has completed peace officer and firearms training, and she is a trained hostage negotiator. (Doc. 34-6 ¶ 8; Doc. 34-7 at 4.) Between 1999 and approximately 2016, she served as a corrections officer with the New York State Department of Corrections and Community Supervision ("NYSDOCCS"). (Doc. 38-5 at 11–12.)

The College hired Ms. Zimpfer as an adjunct professor in 2004, and then as a full-time faculty member in 2007 at an annual salary of $35,000. (Doc. 34-6 ¶ 7.) According to Ms. Zimpfer, the College admitted in or around 2012 that it was paying her "less than my male counterparts for equal work" and granted her "a corresponding equity increase in my salary." (Doc. 38-10 ¶ 22.) The College promoted her to associate professor in 2017. (Doc. 34-6 ¶ 9.)[1]

---

[1] Plaintiff asserts in her Rule 56 statement that the promotion occurred in May 2019. (Doc. 38-1 ¶¶ 12(ii), 56.) The evidence she cites establishes that she had the rank of associate professor in 2019, but not that the promotion occurred in 2019. The court accepts Defendants' evidence that the promotion occurred in 2017.

Ms. Zimpfer assumed responsibilities at Hilbert beyond teaching; she served on various committees, attended events, served as coordinator for the Criminal Justice Studies Division newsletter, and advised a student club. (Doc. 38-10 ¶¶ 8–9.)

In addition to Ms. Zimpfer, the College's Criminal Justice Department employed the following individuals as full-time professors in 2019: Carraugh Reilly Nowak,[2] Mark Paoni, John Culhane, Yvonne Downes, and Martin Floss. (Doc. 34-6 ¶ 12.) Dr. Downs and Dr. Floss have doctorate degrees and were full professors in 2019. (*Id.*) In 2019, Mr. Culhane (hired in 2009 and full-time in 2010), Dr. Paoni (hired 2013), and Ms. Nowak (hired 2007) had less seniority than Ms. Zimpfer but were paid higher salaries. (Doc. 34-6 ¶¶ 13, 15; Doc. 34-37 at 8.) According to Dr. Brophy, Mr. Culhane and Dr. Paoni each "negotiated a higher starting salary than Ms. Zimpfer was paid at their respective times of hire based on their prior experience, doctorate degrees, skills, and market demand." (Doc. 34-6 ¶ 15.)

For at least some of the relevant time, Ms. Nowak served as chair of the department, which carries additional administrative duties and responsibilities. (*Id.* ¶ 14.) Mr. Culhane had a juris doctorate at the time he was hired. (*Id.* ¶¶ 15–16.) He also had previous experience as an FBI employee. (*Id.* ¶ 16.) He assumed additional duties at Hilbert beyond teaching, including developing a new undergraduate degree program and serving as department chair for four years. (*Id.*)[3] Dr. Paoni held a doctorate in educational leadership at the time the College hired him. (*Id.*

---

[2] Some documents in the record hyphenate "Reilly-Nowak," while other documents do not. The court refers to Ms. Nowak without using a hyphen; no disrespect is intended.

[3] In her Rule 56 statement, Plaintiff asserts that she "lacks sufficient knowledge to admit or deny" Mr. Culhane's coursework in Hilbert's graduate program and the nature of Mr. Culhane's additional duties at Hilbert. (Doc. 38-1 ¶ 19.) Rule 56 contemplates situations where facts are unavailable to the nonmovant, but Plaintiff has not satisfied the requirements to obtain relief under Rule 56(d). On summary judgment, "[i]n the face of [Defendants'] evidence, it is

¶¶ 15, 17.)  He also assumed additional duties beyond teaching, including serving as assistant

chair of the Criminal Justice Studies Division.  (*Id.* ¶ 17.)[4]

The evidence in the light most favorable to Ms. Zimpfer indicates that Hilbert faculty

who taught forensics were "at times . . . considered to belong to another 'division' within the

broader Criminal Justice Department."  (Doc. 38-10 ¶ 12.)  The College hired Mary Ann Hobar

as a full-time faculty member in 2003, and she was an associate professor teaching in the

Forensic Science Department in 2019.  (Doc. 34-6 ¶ 18.)  John Reinholz and Dan Culver were

both full-time Hilbert faculty members who taught forensics.  (Doc. 34-37 at 8.)  The College

hired Mr. Culver in 2013; his salary in 2021 was $48,100.  (*Id.*)  He held a master's degree.  (*Id.*)

Mr. Reinholz worked as an adjunct instructor at Hilbert from 2008 to 2015, and the

College hired him as an assistant professor in 2015.  (Doc. 34-11 at 2.)  Mr. Reinholz completed

a master's degree, and he completed some coursework in a doctorate program in 2011–2012.

(*Id.* at 3.)  He served as an adjunct instructor at a community college from 2003 to 2008.  (*Id.*

at 2.)  His salary in 2021 was $52,000.  (Doc. 34-37 at 8.)

In May 2019, Ms. Nowak—chair of the Criminal Justice Department at that time—

informed Provost Lantzky-Eaton that Ms. Zimpfer had a concern that her salary was less than the

salaries of male faculty members in the department.  Dr. Lantzky-Eaton directed Ms. Nowak to

President Brophy to discuss Ms. Zimpfer's concerns.  (Doc. 34-18 ¶ 10.)  On June 5, 2019, Dr.

Brophy met with Ms. Zimpfer, at Ms. Zimpfer's request, to discuss her concerns regarding

---

not enough for [Plaintiff] simply to deny knowledge concerning these matters." *Scholtisek v. Eldre Corp.*, 697 F. Supp. 2d 445, 472 (W.D.N.Y. 2010).

[4] In her Rule 56 statement, Plaintiff asserts that she "lacks sufficient knowledge to admit or deny" Dr. Paoni's coursework in Hilbert's graduate program and the nature of Dr. Paoni's additional duties at Hilbert.  (Doc. 38-1 ¶ 22.)  That is not sufficient to raise a dispute on those points.  *Scholtisek*, 697 F. Supp. 2d at 472.

discrepancies and inequities in the Criminal Justice Department. (Doc. 34-6 ¶¶ 20–21.) At that

meeting, Ms. Zimpfer advised that she believed her salary was lower than the salaries of her

peers. (*Id.* ¶ 22.) According to Ms. Zimpfer, Dr. Brophy offered that the disparity might be

because: "[S]ometimes in higher education, folks that have had a career outside of academia . . .

will sometimes earn less when they work in academia." (Doc. 38-5 at 27.) Dr. Brophy told Ms.

Zimpfer that he was not in a position to review or revise her salary at that meeting, but that her

salary (along with all other faculty salaries) would be reviewed in the following year. (Doc. 34-6

¶ 25.)

Later in the day on June 5, 2019, after meeting with Dr. Brophy, Ms. Zimpfer sent him an

email, copying Ms. Nowak and the College's Human Resources Director, Maura Flynn.

(Doc. 34-12 at 2.) Ms. Zimpfer reiterated her position that there were "gross inequities" in her

annual salary, and she stated that it was "disheartening to learn newer faculty members had a

higher starting salary than my current salary after all these years." (*Id.*) Regarding Dr. Brophy's

commitment to review salaries in the following year, Ms. Zimpfer wrote:

> While I appreciate your willingness to address this issue, waiting a year represents
> a continued pattern of unequal salary and is unreasonable and unacceptable.
> Therefore, I am respectfully requesting an increase in my salary to match my
> colleagues within my division. I cannot sign and return the 2019–2020 academic
> year contract I received in the mail until it is amended to address the inequity in my
> salary and/or the college's intention to remedy this matter.

(*Id.* at 2–3.)

Dr. Brophy responded by email that evening, copying Ms. Nowak, Ms. Flynn, and Dr.

Lantzky-Eaton. (*Id.* at 2.) He reiterated that "there will be no changes in salaries until the

College reviews the matter over the next year." (*Id.*) He also wrote: "I am sure you know what

will happen if you don't return the contract, but that's a decision only you can make." (*Id.*) Ms.

Zimpfer signed and returned the contract, which specified the rank of associate professor and an

annual salary of $43,732.  (Doc. 34-13.)  She was assigned to teach courses during the 2019–2020 academic year.  (Doc. 34-6 ¶ 34.)

On or about September 6, 2019, Ms. Zimpfer filed an internal complaint of gender discrimination in pay with the College's Title IX Officer.  (Doc. 34-21 at 2–3.)

On or about September 12, 2019, at the direction of Dr. Brophy,[5] Ms. Flynn contacted Ms. Zimpfer and informed her that due to suspicious activity on Ms. Zimpfer's Blackboard account,[6] Ms. Zimpfer's access to Hilbert's electronic communication systems was being suspended.  (Doc. 34-18 ¶ 22; Doc. 34-20 ¶ 5.)  The College disabled Ms. Zimpfer's Hilbert email account on or about September 12.  (Doc. 38-9 at 13.)[7]  Ms. Zimpfer's use of Blackboard was not affected.  Ms. Zimpfer spoke with Dr. Lantzky-Eaton on September 12 after Ms. Zimpfer told Ms. Flynn that she believed the College was restricting her access to the email because of her salary complaint and because the College wanted to "get rid of" Dr. Brophy's June 5 email to her.  (Doc. 34-18 ¶ 23.)

Also on September 12, the College took similar actions on the email accounts of three other College employees.  (Doc. 34-18 ¶ 20; *see also* Doc. 38-7 at 12.)  One of the affected employees was Ms. Zimpfer's husband, Randy Zimpfer.  (Doc. 1 ¶¶ 6, 82; Doc. 27 ¶¶ 6, 82.)

---

[5] In her Rule 56 statement, Plaintiff asserts that she "lacks sufficient knowledge to admit or deny" that Ms. Flynn contacted Ms. Zimpfer at Dr. Brophy's direction.  (Doc. 38-1 ¶ 34.)  That is not sufficient to raise a dispute on that point.  *Scholtisek*, 697 F. Supp. 2d at 472.

[6] Blackboard is "a teaching tool used to interact with students online."  (Doc. 1 ¶ 7; Doc. 27 ¶ 7.)

[7] In her Rule 56 statement, Plaintiff asserts that she "disputes that her access was suspended" and that, "[r]ather, her email account was disabled."  (Doc. 38-1 ¶ 35.)  The court concludes that any dispute about whether the interruption in email access was a "suspension" or was a "disabling" of Plaintiff's email account is not material.  The court nevertheless adopts Plaintiff's language describing the interruption as a "disabling" of the account.

The other two affected individuals were Angela Grann and Jenna Dulak, both of whom were members of the College's information technology staff. (*See* Doc. 38-8 at 19–20 (Dr. Brophy's testimony that Grann and Dulak were members of the College's IT staff).) According to network administrator Matt Holmes, Angela Grann was under pressure from Dr. Lantzy-Eaton to quit. (*See* Doc. 38-9 at 20 ("They were trying to make [Grann's] life miserable.").) Dr. Brophy testified that the College terminated Jenna Dulak's employment in or about February 2020 "because of her behavior within our community." (Doc. 38-8 at 22.)

Defendants assert that Ms. Zimpfer's access to her Hilbert email account was restored later in the day on September 12. (Doc. 34-6 ¶ 39; Doc. 34-18 ¶ 27; Doc. 34-20 ¶ 6.) Hilbert network administrator Matt Holmes testified that Dr. Lantzky-Eaton directed him to "re-enable" Ms. Zimpfer's email "a day or two later" but that doing so "ended up being a real big pain because we severed that e-mail account out of her main computer account." (Doc. 38-9 at 16–17.) Ms. Zimpfer testified that she was without email access for approximately a week. (Doc. 38-5 at 33.) It is undisputed that Dr. Lantzky-Eaton sent Ms. Zimpfer an email on September 17, 2019, stating, in part: "At no time were you considered to have engaged in any wrongdoing nor did the institution in any way find that you had engaged in wrongdoing during the course of our investigation." (Doc. 34-19.) According to Dr. Brophy, the investigation revealed that "members of the IT staff were passing around other's login information" and that Jenna Dulak "was at the Zimpfer home breaking into her Blackboard account." (Doc. 38-8 at 18–19.)

Ms. Zimpfer filed a Charge of Discrimination with the New York State Division of Human Rights on or about September 19, 2019. (Doc. 34-21 at 12–17.) She asserted in that

filing, among other things, that the interruption in her access to Hilbert's electronic communication systems was "in retaliation for my complaint against Dr. Brophy." (*Id.* at 16.)

On or about September 27, 2019, Ms. Zimpfer submitted a medical note from her healthcare provider to the College requesting that she be relieved from all on-campus teaching duties until further notice. (Doc. 34-22.) On October 3, 2019, Ms. Flynn informed Ms. Zimpfer that the College had received the medical note and had approved the short-term arrangement that Ms. Zimpfer reached with the department chair, Ms. Nowak, to move her on-campus courses to an online format until her follow-up doctor's appointment on October 18, 2019. (Doc. 34-23.) On or about October 21, 2019, Ms. Zimpfer submitted a medical note to the College indicating that she could perform her on-campus teaching duties one day per week starting on October 22, 2019, until further notice and that she could continue her online teaching duties at that time. (Doc. 34-24.)

Neither of the medical notes described the nature of the medical condition. According to Ms. Zimpfer, she was experiencing "anxiety, depression, panic disorder, and other manifestations of emotional distress such as insomnia" because she feared that the College's action to disable her email account was punishment "for making my complaint" and that the College was "trying to send the message that if I spoke out further, I would be fired." (Doc. 38-10 ¶ 28.)

On or about October 22, 2019, Ms. Nowak emailed Ms. Zimpfer and advised that the College needed clarification about Ms. Zimpfer's medical restriction and that "[u]ntil that is clarified, we cannot have you start back on campus as we want to be sure we are abiding by your doctor's records." (Doc. 34-4 at 33.) Copying Ms. Nowak, Ms. Zimpfer emailed Ms. Flynn later that day to ask "what documentation your office needs." (Doc. 34-26.) She stated that she

was "trying to understand why I am not allowed to return at this time" and requested that Ms. Flynn "advise why reasonable accommodations cannot be made for me to continue instructing my courses." (*Id.*) Ms. Flynn replied on the afternoon of October 23, 2019, stating: "We are currently reviewing your recent doctor's note dated October 21, 2019. We will get back to you as soon as possible." (*Id.*)

Ms. Flynn emailed Ms. Zimpfer on the afternoon of October 24, 2019. (Doc. 34-27.) She wrote that September and October medical notes did not "indicate the nature of your medical condition so it continues to be unclear to the College whether it is related to the medical condition for which you have previously been granted FMLA leave in the past or whether it pertains to a different medical condition." (*Id.*)[8] However, Ms. Flynn wrote that, "[p]er your medical restrictions, effective October 28, 2019," Ms. Zimpfer could teach classes on campus and hold office hours on Mondays and that the College would assign other instructors to teach those on-campus classes on the other days of the week. (*Id.*) Ms. Flynn also advised that "in the event that you were not medically able to return to your regular on-campus teaching duties, you are eligible for FMLA leave for the portion of time that you cannot perform those duties." (*Id.*)

Ms. Zimpfer, Dr. Lantzky-Eaton, and Ms. Nowak had further discussions after Ms. Flynn's October 24 email. Those discussions resulted in an arrangement where Ms. Zimpfer would "teach in a hybrid format." (Doc. 34-20 ¶ 18.) By letter dated November 8, 2019, Ms. Flynn advised Ms. Zimpfer that the College had received supporting documentation for FMLA leave and that "[y]our FMLA leave is approved." (Doc. 34-28 at 2.) The letter confirmed that "Monday will be the designated day of the week for the Fall 2019 semester that you will work on campus" and that the College would allow Ms. Zimpfer "to teach the CJ 200 on-campus course

_____

[8] FMLA refers to the Family and Medical Leave Act, 29 U.S.C. § 2601 et seq.

in a hybrid format for the remainder of this semester." (*Id.*)  The letter also stated that the

calculation of FMLA would be "the actual teaching time" and that Ms. Zimpfer's "accrued sick

time will be used during this FMLA leave time." (*Id.*)

By email dated December 18, 2019, Ms. Flynn noted that Ms. Zimpfer was scheduled to

teach two on-campus classes and two online classes in the spring semester.  (Doc. 34-29 at 3.)

Ms. Flynn also noted that the arrangement allowing Ms. Zimpfer to teach in a "hybrid format"

would not extend into the spring semester.  (*Id.*)  Ms. Flynn requested "an updated medical note

indicating that either your medical restrictions have been lifted" such that Ms. Zimpfer could

teach all four classes "or that your current medical restrictions will remain in place for the Spring

semester and/or have changed but still prevent you from performing your on-campus teaching

duties." (*Id.*)  Ms. Zimpfer replied by email on December 30, 2019, attaching a note from her

medical provider stating: "Donna is under my care for anxiety disorder.  Please allow above

patient return to campus duties for her instruction brick and mortar two days per week, and

instruct her online classes starting 01/13/20 until further notice without restrictions." (*Id.* at 5.)

On January 8, 2020, Ms. Flynn sent Ms. Zimpfer an email confirming receipt of her

December 30 medical note and observing that the medical note indicated that she was medically

able to perform her on-campus teaching duties two days per week for her on-campus classes and

to also teach her two online classes beginning January 13, 2020.  Ms. Flynn also informed Ms.

Zimpfer in the email that the College determined that her updated December 30 medical note

released her to perform all her teaching duties of the spring 2020 semester.  (Doc. 34-29 at 2.)

In anticipation of the fall 2020 semester, the College issued a COVID-19 Response

Manual which stated, among other things, that employees could seek an accommodation of

teaching remotely due to their own chronic medical conditions that would place them at

significant risk of exposure to COVID-19, provided that they supply medical documentation to the College to support such a request. (Doc. 34-30.) Ms. Zimpfer emailed the College Human Resources department on July 24, 2020, formally requesting to instruct her classes remotely for fall 2020. (Doc. 34-31 at 4.) She cited her "personal health history, compromised immune system, and ongoing treatment" and also that she lived with a person who was at high risk due to age and treatment for a lung condition. (*Id.*)

In an email on July 28, 2020, Ms. Flynn asked Ms. Zimpfer to supply medical documentation to support the request. (*Id.* at 3.) Ms. Zimpfer replied later that day and attached a copy of a letter from her doctor stating that she would benefit from working from home during the pandemic due to her history of cancer and chemotherapy treatment. (*Id.* at 5.) Copying Ms. Nowak and Dr. Brophy, Ms. Flynn emailed Ms. Zimpfer on August 10, 2020, and advised her that the College had approved her request for a remote work arrangement for the fall 2020 semester. (*Id.* at 2.)

On or about October 20, 2020, the College granted a 4% base salary increase, effective November 30, 2020, to eligible permanent employees who had been employed by the College in 2019, including Plaintiff and the other faculty in the Criminal Justice Department. (Doc. 1 ¶ 60; Doc. 27 ¶ 60.) In a letter addressed to Ms. Zimpfer and dated November 20, 2020, Dr. Brophy advised:

> [Y]ou will be receiving a salary increase of $4,000.00 in your base pay effective November 30, 2020. The College is in a better position at this time to address the impact of salary compression with regard to your base pay. This increase will be in addition to the 4% increase you were informed of in a letter dated November 10, 2020. Your new annual salary will be $49,481.00 and will be reflected in your paycheck on December 18, 2020.

(Doc. 34-17 at 2.)

Ms. Zimpfer filed her Complaint in this federal lawsuit on February 9, 2021. (Doc. 1.)
On or about February 16, 2021, Ms. Zimpfer informed the College that she would be out of work
for an undetermined period of time and she submitted a medical note to the College dated
February 10, 2021, excusing her from work "until further notice due to illness/injury." (Doc. 34-
33 at 3.) On or about March 9, 2021, Ms. Zimpfer submitted FMLA paperwork to the College
indicating that she would be unable to perform any of her teaching duties and would be out of
work for at least one year due to anxiety. (*Id.* at 16–17.) On or about March 11, 2021, the
College confirmed receipt of the FMLA paperwork and informed Ms. Zimpfer that she was
approved for the full 12 weeks of FMLA leave and an unpaid medical leave for the remainder of
the spring 2021 semester, which was to end on May 31, 2021. (*Id.* at 22.)

On or about March 17, 2021, the College retained Welch Consulting ("Welch") to
conduct a salary study of full-time faculty members. (Doc. 34-35 ¶ 7.) Catherine Massey,
Ph.D., conducted the study for Welch. Dr. Massey completed her study on April 28, 2021. (*Id.*
¶ 10.) According to the executive summary, Dr. Massey determined that, "controlling for
relevant pay factors, our [multiple regression] analysis did not reveal a statistically significant
difference in the pay of women and men." (Doc. 34-37 at 2.) It appears that the controls for
"relevant pay factors" used in the statistical analysis were: attainment of a terminal degree,
department, rank, years as a full-time faculty member, prior teaching experience, and the number
of years of prior teaching experience. (*Id.* at 7.)

The report also indicated that, due to the small number of full-time Hilbert faculty, "even
a statistically insignificant result should be reviewed carefully." (*Id.* at 2.) Dr. Massey therefore
also conducted "Mann-Whitney-Wilcoxon tests," explaining that such tests are more appropriate
than multiple regression analysis in smaller samples. (*Id.*) The "Mann-Whitney-Wilcoxon"

analysis showed a statistically significant difference only "in median female and male pay" when comparing individuals with the rank of assistant professor. (*Id.* at 3.) But Dr. Massey cautioned that "because this test did not control for two factors (terminal degree and number of years teaching experience prior to Hilbert), it does not account for the multi-factor approach used by Hilbert in making salary decisions at the time of hire." (*Id.*)

On or about May 4, 2021, Ms. Zimpfer provided the College with a medical note indicating she was medically cleared to return to her teaching duties starting on May 21, 2021, but that she was restricted to virtual teaching. (Doc. 34-33 at 25.) On May 11, 2021, the College informed Ms. Zimpfer that it had received the May 4 medical note and that she was approved to return to work on May 21, 2021. (*Id.* at 26.) The College further informed Ms. Zimpfer that because all classes would be concluded by May 14, she would be expected to perform administrative and other end-of-year duties on a remote work arrangement until May 31, 2021, which was the end of the academic year. (*Id.*)

At some point after receiving Dr. Massey's report, the College asked Welch to "re-run the regression analysis considering proposed new salaries for certain faculty members." (Doc. 34-35 ¶ 15.) The College also instructed Welch not to control for the rank of the faculty in that analysis. (*Id.*) Welch delivered results of that analysis on or about June 16, 2021. (*Id.*) The new analysis assumed that Ms. Zimpfer was paid a "new salary" of $50,471 (as opposed to her 2021 salary of $49,481). (Doc. 34-38 at 6.) According to Dr. Massey, the proposed "new salary" for Ms. Zimpfer and for other faculty members resulted in a positive difference in pay for women faculty as compared to male faculty, but "did not change the overall conclusion that there was not a statistically significant difference in the pay of men and women faculty at the College." (Doc. 34-35 ¶¶ 16, 18.)

In a letter addressed to Ms. Zimpfer and dated June 23, 2021, Dr. Brophy advised her:

[Y]ou will be receiving a salary increase of $989.62 in your base pay effective
August 1, 2021. The College is in a better position at this time to address the impact
of salary compression with regard to your base pay. Your new annual salary will
be $50,470.62 and will be reflected in your paycheck on August 13, 2021.

(Doc. 34-16 at 2.) Ms. Zimpfer admits receiving Dr. Brophy's November 2020 and July 2021

letters but—for reasons discussed below—she disputes the assertions in the letters that the salary

increases were based on "salary compression."[9]

Ms. Zimpfer states that her "anxiety, depression, panic disorder, and other manifestations

of emotional distress persisted through the remainder of my employment at Hilbert." (Doc. 38-

10 ¶ 32.) She further states that "[o]n April 28, 2022, my stress, anxiety, and mental anguish as a

result of Defendants' treatment of me became so intolerable that I felt no choice but to stop

teaching at Hilbert." (*Id.*)

---

[9] Dr. Brophy testified that "salary compression" is a phenomenon in higher education; he
described it as follows:

[A]n individual's hired at the college in 2002 at a certain salary; and he gets a
certain raise every year—maybe he gets a raise because of his promotion as well.
So he may get an across-the-board raise that we all get, or he may get a raise due to
a promotion from assistant to associate professor. We go ahead and hire someone
in 2012, and for whatever good reason, at that point in time, the market and our
budget allowed for us to make a salary offer that might be higher than his. So he
would be in a place where he would be able to say, I was hired ten years ago; I have
the same credentials as this person; I have exactly the same profile as this person.
Why are they being paid higher than I?

(Doc. 38-4 at 20.) The same term is used in employment contexts outside of higher education.
*See, e.g., Miller v. Am. Fam. Mut. Ins. Co.*, 203 F.3d 997, 1001 (7th Cir. 2000) (discussing salary
compression as "a condition where to attract employees from outside the company, [a
corporation] has to pay them more to perform the same job than it pays its existing employees
who have equal or more experience").

## Summary Judgment Standard

"Summary judgment is warranted only upon a showing that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Friend v. Gasparino*, 61 F.4th 77, 84 (2d Cir. 2023) (internal quotation marks omitted); *see also* Fed. R. Civ. P. 56(a). "In deciding whether such a showing has been made we 'resolve all ambiguities and draw all permissible inferences in favor of the party against whom summary judgment is sought.'" *Id.* (quoting *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003)). "The movant 'bears the initial burden of showing that there is no genuine dispute as to a material fact.'" *McKinney v. City of Middletown*, 49 F.4th 730, 738 (2d Cir. 2022) (quoting *Jaffer v. Hirji*, 887 F.3d 111, 114 (2d Cir. 2018)).

## Analysis

Defendants seek summary judgment on all of the 21 counts in the Complaint. Plaintiff has withdrawn her disability- and race-based discrimination and retaliation claims—Counts 2, 4, 6, 12, 16–18 (Doc. 38 at 7 n.1)—but otherwise opposes the defense motion. The court reviews the defense arguments for each of the remaining claims.

### I.    NYSHRL Claims Against Individual Defendants (Counts 9–11)

Counts 9–11 are brought against all defendants and allege violations of the New York State Human Rights Law ("NYSHRL"). That law states, among other things, that it is unlawful discriminatory practice:

> For an employer or licensing agency, because of an individual's age, race, creed, color, national origin, citizenship or immigration status, sexual orientation, gender identity or expression, military status, sex, disability, predisposing genetic characteristics, familial status, marital status, or status as a victim of domestic violence, to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment.

15

N.Y. Exec. L. § 296(1)(a).  A plaintiff may seek relief for employment discrimination under the NYSHRL "only against an employer."[10]  *Riley v. HSBC USA, Inc.*, 784 F. Supp. 2d 181, 198 (W.D.N.Y. 2011).

The NYSHRL "does not render *employees* liable as individual *employers*."  *Stevenson v. N.Y. State Dep't of Corr. & Cmty. Supervision*, No. 21-cv-355, 2022 WL 179768, at *20 (W.D.N.Y. Jan. 20, 2022) (emphasis added; quoting *Bonaffini v. City Univ. of N.Y.*, No. 20-cv-5118, 2021 WL 2895688, at *2 (E.D.N.Y. July 9, 2021)); *see also Doe v. Bloomberg, L.P.*, 36 N.Y.3d 450, 457 143 N.Y.S.3d 286, 291 (2021) (same).  A defendant can be held liable under this provision "only on an aider-and-abettor theory."[11]  *Baptiste v. City Univ. of N.Y.*, 680 F. Supp. 3d 415, 427 (2023) (citing *Doe v. Bloomberg*).  This limitation applies even when the defendant holds a high rank within the employer.  *See id.* (president of the City College of New York could be liable under the NYSHRL only on an aider-and-abettor theory).

The court rejects Plaintiff's contention that the individual defendants can be liable under the NYSHRL because they "had the power to hire and fire Ms. Zimpfer."  (Doc. 38 at 30.) Defendants concede that Dr. Brophy had the power to hire and fire College employees, but they assert that neither Dr. Lantzky-Eaton nor Ms. Flynn had authority to terminate Ms. Zimpfer's employment.  (Doc. 39 at 13 n.7.)  However, for the reasons below, the court concludes that any dispute as to Dr. Lantzky-Eaton and Ms. Flynn's authority on this point is immaterial.

Plaintiff cites *Scalera v. Electrograph Systems, Inc.* for the proposition that individual liability under the NYSHRL can be established when the defendant "has the power to hire and

---

[10] There is no claim here that any defendant is a "licensing agency."

[11] Counts 13–21 seek to hold the individual defendants liable on aider-and-abettor theories.  The court analyzes the individual defendants' arguments for summary judgment on those counts below.

fire the plaintiff." 848 F. Supp. 2d 352, 371 (E.D.N.Y. 2012) (quoting *Messer v. Fahnestock & Co.*, No. 03-cv-04989, at \*9 (E.D.N.Y. 2008)). But *Scalera* was decided before the *Doe v. Bloomberg* Court clarified its 1984 decision in *Patrowich v. Chemical Bank*, 63 N.Y.2d 541, 483 N.Y.S.2d 659. As explained in *Doe v. Bloomberg*, some courts had previously "misinterpret[ed] *Patrowich* as making the 'ownership/personnel decisions' test relevant to defining 'employer' in . . . the State HRL." *Doe v. Bloomberg*, 36 N.Y.3d at 457. That test was relevant to federal antidiscrimination statutes, but not to the NYSHRL, "under which a corporate employee simply does not qualify as an 'employer,' regardless of the employee's position or relationship to the employer." *Id.* at 458.

Citing that language from *Doe v. Bloomberg*, Plaintiff asserts that "Brophy, Lantzky, and Flynn are not *corporate* employees." (Doc. 38 at 30 (emphasis added).) Defendants maintain that Plaintiff's assertion on this point lacks "any support whatsoever." (Doc. 39 at 12.) The court agrees with Defendants on this point. No evidence indicates that Hilbert College is not an "education corporation" as defined in N.Y. Educ. Law § 216-a. Hilbert College might not be a for-profit corporation, but it is undoubtedly a "corporation" with employees, including the individual defendants at the times relevant to this litigation. The court concludes that Defendants Brophy, Lantzky-Eaton, and Flynn are entitled to summary judgment on Counts 9–11. For the separate reasons discussed below, the College is also entitled to summary judgment on those counts.

## II.    Gender Discrimination Claims (Counts 1, 3, 7, and 9)

Counts 1, 3, 7, and 9 all involve claims of gender discrimination. Plaintiff claims in Counts 1 and 7 that the College paid her at a lower rate than her male colleagues, in violation of the federal Equal Pay Act ("EPA"), 29 U.S.C. § 206(d)(1) (Count 1) and New York Labor Law

("NYLL") § 194 (Count 7). She claims in Counts 3 and 9 that the College discriminated against her because she is female, in violation of Title VII of the Civil Rights Act of 1964 (Count 3) and the NYSHRL (Count 9). The court begins with the claims brought specifically under the federal and state laws addressing discrimination in pay.

### A.    Pay Discrimination Under the EPA and NYLL (Counts 1 and 7)

The EPA provides, in pertinent part:

> No employer . . . shall discriminate . . . between employees on the basis of sex by paying wages to employees . . . at a rate less than the rate at which [it] pays wages to employees of the opposite sex . . . for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions, except where such payment is made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex . . . .

29 U.S.C. § 206(d)(1). The exceptions listed (i)–(iv) each operate as an affirmative defense. *Eisenhauer v. Culinary Inst. of Am.*, 84 F.4th 507, 515 (2d Cir. 2023).[12]

"A plaintiff must establish a *prima facie* EPA case by demonstrating that 'i) the employer pays different wages to employees of the opposite sex; ii) the employees perform equal work on jobs requiring equal skill, effort, and responsibility; and iii) the jobs are performed under similar working conditions.'" *Id.* at 523 (quoting *Belfi v. Prendergast*, 191 F.3d 129, 135 (2d Cir. 1999)). "If the plaintiff has established a *prima facie* case, the burden of persuasion shifts to the employer to show that one of the EPA's affirmative defenses justifies the pay disparity." *Id.* "[A] plaintiff may counter a defendant's affirmative defense to an EPA claim with evidence of

---

[12] The Second Circuit decided *Eisenhauer* after the parties completed their briefing on the summary judgment motion in this case. The court and the parties discussed the *Eisenhauer* decision at the motion hearing on May 13, 2025.

pretext." *Id.* at 518 n.48 (quoting *Ryduchowski v. Port Auth. of N.Y. & N.J.*, 203 F.3d 135, 142 (2d Cir. 2000)).

New York Labor Law § 194 is similar to the EPA; it also "prohibits pay discrimination on the basis of sex." *Id.* at 524. Like the EPA, § 194 includes four exceptions to the prohibition on sex-based discrimination. *Id.* at 525. Unlike the EPA, a defendant seeking to establish the "factor other than sex" defense to a § 194 claim must prove "that the pay disparity in question results from a differential based on a job-related factor." *Id.* The court considers the prima facie case, defenses, and pretext in turn.

### 1.    Prima Facie Case

Defendants assert that Plaintiff cannot prove a prima facie violation. They begin by noting that, even though Ms. Zimpfer was paid less than the full-time male faculty members in the Criminal Justice Department, she was also paid less than the other full-time *female* faculty members. (Doc. 34-2 at 9.) Ms. Zimpfer maintains that "[t]he fact that there were also women in the Criminal Justice Department who were paid more than Ms. Zimpfer is immaterial to the *prima facie* analysis." (Doc. 38 at 10.) In support, Ms. Zimpfer cites the Second Circuit's analysis of the EPA claims in *Lavin-McEleney v. Marist College*, 239 F.3d 476 (2d Cir. 2001). Defendants argue that *Lavin-McEleney* does not support Plaintiff's argument. (Doc. 39 at 5.)

The court agrees with Ms. Zimpfer that her prima facie case requires her to show that Hilbert paid her less than comparable male employees; the presence of higher-paid comparable female employees does not defeat the prima facie case. Defendants argue that the *Lavin-McEleney* court "mentioned" the fact that the plaintiff, a female professor, was paid less than another comparable female professor, but that the court otherwise did not "discuss[] or evaluate[]" that fact in the course of the decision affirming a judgment for the plaintiff. (Doc. 39

at 5.)  But the *Lavin-McEleney* court did not need to include more discussion on that issue.  As other courts in this circuit have concluded: "Because the EPA prohibits paying an employee less than members of the opposite sex for performing the same work, a *prima facie* case requires proof only that the plaintiff was paid less than comparable members of the opposite sex, as in *Lavin-McEleney*." *Hatzimihalis v. SMBC Nikko Sec. Am., Inc.*, No. 20 Civ. 8037, 2023 WL 3764823, at *7 (S.D.N.Y. June 1, 2023).

As to the higher-paid male faculty members, Defendants maintain that Ms. Zimpfer cannot prove that the jobs held by the male faculty required "equal skill, effort and responsibilities." (Doc. 34-2 at 9.)  Ms. Zimpfer insists that she has established the prima facie case because "Defendants paid at least four male faculty members a higher salary than Ms. Zimpfer for substantially equivalent work under similar working conditions." (Doc. 38 at 9.)[13]

As this court has explained, the "equal work" inquiry "requires evidence that the jobs compared are substantially equal." *Woods-Early v. Corning Inc.*, No. 18-CV-6162, 2023 WL 4598358, at *4 (W.D.N.Y. July 18, 2023) (quoting *Chiaramonte v. Animal Med. Ctr.*, 677 F. App'x 689, 691 (2d Cir. 2017)).

> A plaintiff must establish that the jobs compared entail *common duties or content, and do not simply overlap in titles or classifications.* A successful claim depends on the comparison of actual job content; broad generalizations drawn from job titles, classifications, or divisions, and conclusory assertions of sex discrimination, cannot suffice.  Relevant factors include whether plaintiff and her comparators had the same title or rank; worked for the same division; shared supervisors; had analogous managerial responsibilities; performed the same tasks; had the same skills or experience; and worked on projects of a similar size or budget.

---

[13] Defendants have assumed for present purposes that the working conditions were "similar" for Ms. Zimpfer and her alleged comparators. (Doc. 34-2 at 10 n.4.)  The court therefore focuses below on the "equal work" element.

*Id.* (cleaned up). "While the equal work inquiry does not demand evidence that a plaintiff's job is 'identical' to a higher-paid position, the standard is nonetheless demanding, requiring evidence that the jobs compared are 'substantially equal.'" *E.E.O.C. v. Port Auth. of N.Y. & N.J.*, 768 F.3d 247, 255 (2d Cir. 2014). "While summary judgment dismissing an EPA claim based on a plaintiff's failure to prove 'substantial equivalence' may be appropriate where the undisputed facts establish that the positions at issue are manifestly unequal, where the salient facts are disputed, '[substantial equivalence] for Equal Pay Act purposes is a question for the jury.'" *McCullough v. Xerox Corp.*, 224 F. Supp. 3d 193, 197 (W.D.N.Y. 2016) (alterations in original; quoting *Lavin-McEleney*, 239 F.3d at 480).

The full-time male comparators from the Criminal Justice Department are Dr. Paoni, Mr. Culhane, and Dr. Floss. The full-time male comparators who taught forensics are Mr. Reinholz and Mr. Culver. Dr. Floss was a full professor; Dr. Paoni (like Ms. Zimpfer) was an associate professor; and Mr. Culhane, Mr. Reinholz, and Mr. Culver were assistant professors. It appears to be undisputed that "[u]nless a release is granted, full-time faculty members were required to teach the same course load." (Doc. 34-2 at 12 n.5.)[14] The department chair would teach a reduced courseload because of the additional duties required of the chair. (Doc. 38-5 at 23.) Faculty would "[u]sually" teach both "core" and "advanced" classes, but the College did not require each faculty member to teach both types of classes. (Doc. 38-6 at 7.) Ms. Zimpfer testified that she believes she was qualified to teach the courses that Dr. Paoni and Mr. Culhane were teaching in fall 2019. (Doc. 38-5 at 19, 21–22.)

---

[14] Defendants assert this fact in their memorandum, citing Dr. Lantzky-Eaton's deposition. The cited pages of the deposition do not appear on the docket, but Plaintiff does not dispute Defendants' assertion on this point. (*See* Doc. 38 at 14.)

The parties have significantly different views on Ms. Zimpfer's skills and experience versus the male comparators.  Defendants assert that Ms. Zimpfer was "less educated, had less teaching experience, had less specialized training and performed fewer duties than each of the male professors she attempts to compare herself to."  (Doc. 34-2 at 11.)  Ms. Zimpfer maintains that she has "extensive experience, training, education, and abilities directly applicable to her performance requirements and the job content" as a CJ professor, and that her "relative seniority at Hilbert would lead a reasonable fact-finder to conclude that her skills were *at least* equivalent, if not superior, to those of her less senior male colleagues."  (Doc. 38 at 11–12.)

In this case, the court cannot conclude that undisputed evidence shows Ms. Zimpfer's position and the positions of the male comparators to be "manifestly unequal."  There is certainly undisputed evidence of some differences.  But, as discussed below, the differences are not sufficient for the court to conclude at this stage that the "actual job content" was not substantially equivalent.

Dr. Paoni and Mr. Culhane both hold "terminal" degrees, an achievement that carries "significant value" for College faculty, according to Dr. Brophy.  (Doc. 34-6 ¶ 15.)  Although perhaps less relevant to the level of pay, Dr. Lantzky-Eaton testified that, in hiring professors, the CJ department has no preference for Ph.D. candidates, and that the department would accept a professor who held a master's degree.  (Doc. 38-6 at 6.)  Indeed, according to Dr. Lantzky-Eaton, in the CJ department "it was probably more common to see people hired at Hilbert with a master's degree."  (*Id.* at 5.)  Mr. Reinholz and Mr. Culver have master's degrees.

Ms. Zimpfer has 17 years of experience as a correctional officer with the Department of Corrections, whereas Dr. Paoni has 23 years of experience as a road patrol deputy with a sheriff's office (Doc. 34-9 at 4) and Mr. Culhane has 30 years of federal law enforcement

experience, including as an FBI special agent for 19 years plus 10 years as a supervisory special agent (Doc. 34-8 at 3–4).  Mr. Reinholz has 20 years of experience with the New York State Police, most recently as a criminal investigator.  (Doc. 34-11 at 2.)

All four of these individuals completed various specialized trainings or carried certifications relevant to that past employment.  (*See* Doc. 34-7 at 3–4 (Ms. Zimpfer's peace officer, firearms, and hostage negotiation training); Doc. 34-8 at 3 (Mr. Culhane's prior work as a certified instructor and firearms instructor and trainer on legal standards); Doc. 34-9 at 4 (Dr. Paoni's multiple prior certifications, including instructor evaluator); Doc. 34-11 at 3 (Mr. Reinholz's certifications and professional development).)  Although the above past work experience differs in some respects, Ms. Zimpfer, Dr. Paoni, Mr. Culhane, and Mr. Reinholz all had significant experience in law enforcement.[15]

Defendants assert that Dr. Paoni, Mr. Culhane, and Mr. Reinholz had more teaching experience than Ms. Zimpfer.  (Doc. 34-2 at 11.)  Ms. Zimpfer maintains that her total teaching experience was at least equal to Mr. Reihnolz's, and that she had more total teaching experience than Mr. Culhane, Dr. Paoni, and Mr. Culver.  (Doc. 38 at 12.)  The record shows that Ms. Zimpfer taught as an adjunct instructor at a community college in the 2004–2005 academic year. Before her promotion to associate professor in 2017, she taught at Hilbert from 2004–2016 as an adjunct professor (2004–2007) and then as a full-time assistant professor (2007–2016). (*See* Doc. 1 ¶ 54; Doc. 27 ¶ 54; Doc. 34-6 ¶ 7; Doc. 34-7 at 3.)  By the time she separated from employment at Hilbert in 2022, she had approximately 18 years of total teaching experience, about 15 of which were years where she taught full time.

---

[15] Correctional officers are peace officers under New York law.  N.Y. Crim. Proc. § 2.10(25).

Mr. Culhane taught for two academic years as an assistant professor at a community college before Hilbert hired him as an assistant professor. (Doc. 34-8 at 7.) He taught classes at Hilbert as a full-time professor every academic year from fall 2010 through fall 2017. (*Id.* at 5–7.) Dr. Paoni taught two classes as an adjunct faculty member at the Rochester Institute of Technology from 2006–2009. (Doc. 34-9 at 3.) His first work as a full-time professor was at Hilbert in 2013. (*Id.* at 2–3.) The record appears to contain few details about whether Mr. Culver had teaching experience prior to joining Hilbert in 2013. Before joining the Hilbert faculty, Mr. Reinholz had experience as an adjunct instructor at a community college (2003–2008) and as a full-time instructor at Bryant & Stratton College (2006–2015). (Doc. 34-11 at 2.) Considering all these facts in the light most favorable to Ms. Zimpfer, the court cannot conclude that any difference in the male comparators' teaching experience was so great that the professorships being compared are "manifestly unequal."

The court reaches a similar conclusion as to the duties that each professor assumed in addition to their courseloads. As noted above, Ms. Zimpfer assumed responsibilities at Hilbert beyond teaching. She was a member of two College committees and served on the Student Success Team. (Doc. 38-10 ¶ 8.) She attended College dinners and receptions, was "active in Hilbert recruitment," and spoke at open houses on Hilbert's behalf. (*Id.*) She also served as a student liaison for Hilbert students undergoing NYSDOCCS background processing, was the campus coordinator for the state Department of Motor Vehicles "Covert Monitor Program," volunteered at the College's "Commuter Bar-B-Que," and coordinated the CJ Division Newsletter. (*Id.*) In addition, Ms. Zimpfer served for two years as the Criminal Justice/Forensic Science ("CJ/FS") Club advisor. (*Id.* ¶ 9.)

At least two of the male comparators also undertook additional responsibilities beyond teaching their courseloads.  Mr. Culhane developed a new undergraduate degree program in Intelligence and, as noted above, served as department chair.  (Doc. 34-6 ¶ 16.)  Dr. Paoni was involved in College admissions and recruiting, advised the CJ/FS Club, served on two College committees, and had other leadership roles including coordinator of the CJ interns and online CJ master's programs, advisor of the men's lacrosse team, and founder of the College "Elite Program."  (Doc. 34-9 at 2–3.)

Ultimately, the court concludes that undisputed facts in this case do not establish that Ms. Zimpfer's position and the positions of her male comparators are "manifestly unequal."  Given the undisputed fact that the College paid Dr. Paoni, Mr. Culhane, and Mr. Reinholz more than it paid Ms. Zimpfer, the court concludes that Plaintiff has supplied sufficient evidence to establish a prima facie case under both the EPA and NYLL § 194.

### 2.    "Factors Other Than Sex" Defense

A defendant seeking to establish any of the four defenses has a "heavy" burden "because the statutory exceptions are 'narrowly construed.'"  *Ryduchowski*, 203 F.3d at 143 (quoting *Timmer v. Mich. Dep't of Com.*, 104 F.3d 833, 843 (6th Cir. 1997) and *EEOC v. Aetna Ins. Co.*, 616 F.2d 719, 724 (4th Cir. 1980)).  Defendants seek summary judgment based on the "factors other than sex" affirmative defense.  (Doc. 34-2 at 11.)  "To establish the EPA's 'factor other than sex' defense, a defendant must prove only that the pay disparity in question results from a differential based on any factor except for sex."  *Eisenhauer*, 84 F.4th at 522–23.

The court begins with Defendants' assertion that "[d]ifferences in faculty salaries can be caused by a multitude of factors, including when individuals are hired, individual skills, the possession of or lack of terminal degrees, experience and qualifications, market demand and

salary compression." (Doc. 34-2 at 12.)  Defendants maintain that "such factors influenced the compensation of the three male professors that Zimpfer alleges were paid more than her."  (*Id.*)

Ms. Zimpfer relies on *Tomka v. Seiler Corp.*, 66 F.3d 1295 (2d Cir. 1995), for the proposition that the factors upon which Defendants rely are not "job-related."  (*See* Doc. 38 at 15; *see also id.* at 16 (citing *Belfi*, 191 F.3d at 136).)  But *Eisenhauer* appears to have implicitly overruled *Tomka* insofar as *Tomka* suggested that the defendant asserting a "factors other than sex" defense must show that experience (or any other factor) "is a job-related qualification for the position in question."  *Tomka*, 66 F.3d at 1312.[16]  The court therefore rejects that line of argument against the "factors other than sex" defense to the EPA claim.[17]

However, Ms. Zimpfer also relies on *Tomka* to argue that Defendants have supplied only "vague claims" regarding the "multitude of factors" that might affect salaries and that such "unsupported and nonspecific claims" are insufficient to justify summary judgment for Defendants based on the "factors other than sex" defense.  (Doc. 38 at 15–16.)  The *Tomka* court determined that the corporate defendant was not entitled to summary judgment on its "factors other than sex" defense, in part because the defendant did not "particularize[]" how each of the "variety of factors" upon which it relied explained the salary discrepancy.  *Tomka*, 66 F.3d at 1312.  Defendants insist that *Tomka* is distinguishable because, in their view, "[e]ach employee identified by Plaintiff in her complaint is discussed in detail and the reasons for

---

[16] As noted in *Eisenhauer*, 84 F.4th at 523 n.83, the Supreme Court's decision in *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742 (1998), also abrogated portions of the *Tomka* decision.  That abrogation does not appear to impact the analysis here.

[17] The same limitation does not apply to the NYLL claim.  *See Eisenhauer*, 84 F.4th at 526.  However, for the reasons discussed below, Plaintiff does not need to prevail on her claim that the Defendants have not shown that the relevant factors were job-related.  Regardless of whether the relevant factors were job-related, Defendants are not entitled to summary judgment on their "factors other than sex" defense under either the EPA or the NYLL.

differences in salaries between Plaintiff and each comparator [are] explained, including the additional administrative responsibilities of each faculty." (Doc. 39 at 9.)

Here, similar to the defendant in *Tomka*, Defendants rely on Dr. Brophy's assertions that starting salaries for Hilbert faculty members are "largely driven by external market conditions" (Doc. 34-6 ¶ 11) and that differences in faculty salaries can be caused by the "multitude of factors" listed above (*id.* ¶ 23). The court assumes that Defendants in this case have supplied more detail and discussion about these factors than the defendants produced in *Tomka*. However, resolving all ambiguities and granting all permissible inferences in Ms. Zimpfer's favor, the court cannot conclude as a matter of law that any of these factors (individually or in combination) explains the wage differential. In this case, as in *Tomka*, the College's evidence "raises a fact issue" as to that question but does not entitle the College to summary judgment on the "factors other than sex" defense. *Tomka*, 66 F.3d at 1312.

Defendants also contend that Dr. Massey's salary study "confirmed that gender played no role in differences in salaries at the College." (Doc. 34-2 at 12.) Plaintiff disagrees, arguing that the study is "fatally flawed and fails to justify the wage disparity between Ms. Zimpfer and her comparators." (Doc. 38 at 17.) She contends that Dr. Massey's findings are unreliable due to the small sample size, and that the study "relies on misleading data regarding Ms. Zimpfer's salary and years of experience." (*Id.*) Defendants reply that Plaintiff has produced no expert to contradict Dr. Massey and instead merely seeks to discredit Dr. Massey "through unsupported assertions in a memorandum of law." (Doc. 39 at 8.)

Putting aside Plaintiff's criticism of the sample size, the court concludes that there are genuine disputes as to the validity of the data used in Dr. Massey's analysis. One such dispute stems from the fact that the study used 2021 salaries in its comparison, whereas Ms. Zimpfer

received a $4,000 raise in 2020 that was in addition to the 4% raise announced earlier that year. A jury could discredit Dr. Massey's analysis if it concluded that the analysis should have used Ms. Zimpfer's salary before that $4,000 raise. *See generally Bloom v. ProMaxima Mfg. Ltd.*, No. 05-CV-6735, 2010 WL 1533389, at *4 (W.D.N.Y. Apr. 15, 2010) ("Whether to accept or reject any expert opinion is clearly with in the province of the jury.").

### 3.    Pretext

Finally, Defendants assert that "Plaintiff will not be able to demonstrate that the College's legitimate, nondiscriminatory reasons for the wage disparity was pretextual." (Doc. 34-2 at 14.)  According to Defendants: "The College's proffered reasons for any pay disparity between Zimpfer and her male colleagues cannot be disputed and are supported by admissible statistical analysis."  (*Id.*)  Plaintiff insists that "[t]here is abundant evidence in the record to establish that Defendants' purported justifications for Ms. Zimpfer's lower pay are pretext for discrimination."  (Doc. 38 at 18.)

In the context of the EPA, the Second Circuit has instructed that "[t]he appropriate inquiry to determine if the factor put forward is a pretext, is whether the employer has used the factor reasonably in light of the employer's stated purpose as well as its other practices." *Aldrich v. Randolph Cent. Sch. Dist.*, 963 F.2d 520, 526 (2d Cir. 1992) (cleaned up).[18]  This is ordinarily a jury question. *Cf. Mackey v. Unity Health Sys.*, No. 03-CV-6049, 2004 WL 1056066, at *6 (W.D.N.Y. May 10, 2004) (Title VII retaliation context).  However, courts have granted summary judgment on EPA claims upon finding insufficient evidence for a reasonable jury to

---

[18] In the context of Title VII of the Civil Rights Act of 1964, the Second Circuit has stated: "To show pretext, a plaintiff can point to 'weaknesses, implausibilities, inconsistencies, or contradictions in" an employer's offered reason" for a pay disparity. *King v. Aramark Servs. Inc.*, 96 F.4th 546, 565 (2d Cir. 2024) (quoting *Zann Kwan v. Andalex Grp., LLC*, 737 F.3d 834, 846 (2d Cir. 2013)).

determine that the employer's explanation was pretext. *E.g.*, *Setelius v. Nat'l Grid Elec. Servs. LLC*, No. 11-CV-5528, 2014 WL 4773975, at *32 (E.D.N.Y. Sept. 24, 2014).

The defendant in *Setelius* produced evidence that it generally offered greater compensation to employees with professional degrees and extensive work experience. *Id.* The court concluded that "[i]n the absence of any evidence by Plaintiff to overcome this explanation, no reasonable jury could find that the explanation is pretext for sex discrimination." *Id.* Here, similar to the employer in *Setelius*, the College in this case has offered evidence that it places a premium on "terminal" academic degrees. (Doc. 34-6 ¶ 15.) But in this case, for the reasons discussed below, the court concludes that Plaintiff has produced evidence from which a reasonable jury could find pretext.

The considerations relevant to the "pragmatic standard" outlined in *Aldrich* necessarily "vary with the situation." *Kouba v. Allstate Ins. Co.*, 691 F.2d 873, 876–77 (9th Cir. 1982). In this case, Plaintiff argues that one basis for finding the College's proffered reasons pretextual is that "Defendants simply cannot keep their story straight regarding the reasons for the pay disparity." (Doc. 38 at 18.) Plaintiff contrasts Dr. Brophy's suggestion at the June 5, 2019, meeting regarding Ms. Zimpfer's prior career outside academia (Doc. 38-5 at 27), with the "salary compression" explanations in November 2020 and June 2021 (Doc. 34-16 at 2; Doc. 34-17 at 2), and with Dr. Brophy's assertions in his January 2023 declaration that comparators Culhane and Paoni "negotiated a higher starting salary" and were paid "based on their prior experience, doctorate degrees, skills, and market demand" (Doc. 34-6 ¶ 15).

An employer's "shifting and inconsistent explanations" for its conduct can be evidence of pretext. *Costa v. Sears Home Improvement Prods., Inc.*, 65 F. Supp. 3d 333, 353 (W.D.N.Y. 2014) (citing *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 847 (2d Cir. 2013)); *see also*

*EEOC v. Ethan Allen, Inc.*, 44 F.3d 116, 120 (2d Cir. 1994) (discrepancies that could support finding of pretext included employer's shifting explanations; citing cases). Here, Dr. Brophy's remark about prior experience outside academia might not have been intended as a comprehensive or definitive explanation for any pay disparity. And the College offered the "salary compression" explanation to support raises in November 2020 and June 2021, without necessarily relying on that explanation as a reason for any sex-based difference in pay. Still, the court concludes that a jury should evaluate the extent to which the College's explanation might have changed over time.

Plaintiff also suggests that Dr. Brophy has supplied conflicting testimony about whether his June 5, 2019, conversation with Ms. Zimpfer involved any discussion of gender as a possible basis for the issues regarding faculty pay that Ms. Zimpfer had raised. (*See* Doc. 38 at 18–19.) At his deposition, Dr. Brophy testified that the June 5 meeting involved no discussion of "complaints regarding salary discrepancies between male and female professors" and that the issue of "discrepancies between gender . . . did not come up" at that meeting. (Doc. 38-4 at 11–12, 16.) At the same time, Dr. Brophy states in his declaration that Ms. Zimpfer informed him at the June 5 meeting "that her salary had been adjusted earlier in her career in 2012 . . . because her salary was lower than her male colleagues at the time." (Doc. 34-6 ¶ 22.)[19]

Finally, Plaintiff asserts (Doc. 38 at 19) that Dr. Brophy has implausibly claimed that he asked Welch to include an analysis of male and female salaries because it was "the right thing to do" as the College was addressing an issue of salary compression (Doc. 38-4 at 16–17) and

---

[19] Dr. Brophy's declaration also includes a statement that, "[O]ther than Ms. Zimpfer, none of the faculty members that discussed concerns about salaries with me raised the issue of gender disparity in salaries." (Doc. 34-6 ¶ 23.) Even resolving all ambiguities in Plaintiff's favor, the court is not convinced that this is evidence that Ms. Zimpfer raised the issue of gender disparity in salaries *at the June 5 meeting*.

because "[w]e planned to review those things that we could put our hands on easily" (*id.* at 30),

rather than because Ms. Zimpfer had raised a complaint about gender discrepancies in salaries.

In contrast, Plaintiff notes Dr. Massey's statement that the purpose of the analysis that she

performed "was to determine whether there were pay disparities between male and female

faculty members at the College." (Doc. 34-35 ¶ 7.) Based on the above, the court concludes that

a reasonable jury could conclude that the College's explanations for the disparities were pretext

for gender-based discrimination in pay.

> **B.      Gender Discrimination (Counts 3 and 9)**

In addition to the discrimination claims under the EPA and NYLL § 194, Plaintiff alleges

violations of Title VII of the Civil Rights Act of 1964 ("Title VII") (Count 3) and the NYSHRL

(Count 9).[20] Title VII and the NYSHRL cover a broader range of discriminatory practices than

the EPA and the NYLL because discrimination in pay is not "the only way in which an employer

might achieve [a] discriminatory purpose." *Lenzi v. Systemax, Inc.*, 944 F.3d 97, 110 (2d Cir.

2019). Here, Plaintiff's claims in Counts 3 and 9 are claims of unequal pay for equal work under

Title VII and under the NYSHRL. (*See* Doc. 1 ¶¶ 119–122; ¶¶ 151–158.) Such claims are

"generally analyzed under the same standards used in an EPA claim." *Id.* at 109 (quoting *Belfi*,

191 F.3d at 139).

Defendants seek summary judgment on the Title VII and NYSHRL pay-discrimination

claims for the same reasons that they seek summary judgment on the EPA and NYLL claims.

(Doc. 34-2 at 16.) For the reasons discussed above as to the latter claims, the court rejects those

arguments. Defendants observe, however, that Plaintiff has an additional burden on her Title VII

---

[20] The parties agree that the Title VII and NYSHRL claims involve the same analysis.
(Doc. 34-2 at 15 n.7; Doc. 38 at 20 n.10.)

31

and NYSHRL claims: she "must also produce evidence of discriminatory animus." *Lenzi*,

944 F.3d at 109 (quoting *Tomka*, 66 F.3d at 1313). Defendants assert that Plaintiff has not

provided such evidence of intent. (Doc. 34-2 at 16.) Plaintiff insists that there is ample evidence

of discriminatory animus based on Defendants' purportedly shifting explanations for the pay

disparity and for the $4,000 raise that Plaintiff received in November 2020. (Doc. 38 at 21–22.)

She also contends that Defendants attempted to "cover up" the findings in Dr. Massey's April

2021 report by instructing her to re-run the analysis. (*Id.* at 22–23.)

"[C]ourts should be cautious about granting summary judgment in cases where motive,

intent or state of mind are at issue, a common component of discrimination actions . . . ." *Wright*

*v. Eastman Kodak Co.*, 550 F. Supp. 2d 371, 377 (W.D.N.Y. 2008). At the same time, "the

salutary purposes of summary judgment—avoiding protracted, expensive and harassing trials—

apply no less to discrimination cases than to . . . other areas of litigation." *Id.* (alteration in

original; quoting *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985)). Summary judgment is

appropriate if Plaintiff has not produced evidence of discriminatory intent to support a Title VII

claim. *See Belfi*, 191 F.3d at 140.

Here, Plaintiff relies in part on the evidence supporting her prima facie case.

(*See* Doc. 38 at 20.) It is true that "a prima facie case, combined with sufficient evidence to find

that the employer's asserted justification is false, may permit the trier of fact to conclude that the

employer unlawfully discriminated." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133,

148 (2000) (discussing intentional discrimination in the context of the Age Discrimination in

Employment Act). The court has reviewed that evidence above.

Here, as in *Belfi*, Plaintiff relies on purported inconsistencies in the College's explanation

for the wage disparity. But such inconsistent explanations "do not constitute proof that the

32

[College] intended to discriminate against plaintiff because she was a woman." *Belfi*, 191 F.3d at 140. "Absent that proof, a jury could not simply infer a discriminatory intent." *Id.* Plaintiff's assertion that the College attempted to "cover up" the findings in Dr. Massey's April 2021 report is also insufficient; there is no evidence that re-running the study without controlling for faculty rank invalidated the April 2021 report or made it inaccessible. The court therefore concludes that Defendants are entitled to summary judgment on Counts 3 and 9.

## III.    Retaliation and Hostile-Work-Environment Claims (Counts 5, 8, 10–11)

Plaintiff's remaining retaliation claims appear in Counts 5, 8, and 11.[21] The hostile-work-environment claims appear in Counts 5, 10, and 11. Defendants seek summary judgment on both sets of claims. (Doc. 34-2 at 19.) The court considers the retaliation and hostile-work-environment claims in turn.

### A.    Retaliation Claims (Counts 5, 8, 11)

The parties do not dispute the law that applies to the claims in Counts 5, 8, and 11, which respectively allege retaliation in violation of Title VII, NYLL § 215, and the NYSHRL.[22] The same standard applies to all three claims. *See Woods-Early*, 2023 WL 4598358 at *11 (Title VII and NYSHRL); *Zuckerman v. GW Acquisition LLC*, No. 20-CV-8742, 2021 WL 4267815, at *17

---

[21] As noted above, Plaintiff has withdrawn the race-based retaliation claim in Count 6.

[22] Count 8 does not expressly invoke NYLL § 215, but the court infers that Count 8 is based upon that antiretaliation provision. Section 215(1)(a) provides, in pertinent part:

> No employer . . . shall discharge, threaten, penalize, or in any other manner discriminate or retaliate against any employee (i) because such employee has made a complaint to his or her employer, or to the commissioner or his or her authorized representative, or to the attorney general or any other person, that the employer has engaged in conduct that the employee, reasonably and in good faith, believes violates any provision of this chapter, . . . [or] (iii) because such employee has caused to be instituted or is about to institute a proceeding under or related to this chapter . . . .

(S.D.N.Y. Sept. 20, 2021) (elements of prima facie retaliation case are essentially the same for Title VII, NYLL, and NYSHRL); *see also Centeno-Bernuy v. Perry*, No. 03-CV-457, 2009 WL 2424380, at *8 (W.D.N.Y. Aug. 5, 2009) (same *McDonnell Douglas* burden-shifting framework for both FLSA retaliation and Title VII retaliation claims); *Jones v. Pawar Bros. Corp.*, 434 F. Supp. 3d 14, 27 (E.D.N.Y. 2020) (NYLL § 215 and FLSA antiretaliation provisions are nearly identical).

Thus, to prove her retaliation claims in Counts 5, 8, and 11, Plaintiff must first demonstrate a prima facie retaliation case by showing that "(1) she was engaged in protected activity; (2) the employer was aware of that activity; (3) the employee suffered a materially adverse action; and (4) there was a causal connection between the protected activity and that adverse action." *Qorrolli v. Metro. Dental Assocs.*, 124 F.4th 115, 122 (2d Cir. 2024) (quoting *Lore v. City of Syracuse*, 670 F.3d 127, 157 (2d Cir. 2012)). "If the plaintiff establishes a *prima facie* case, 'the burden shifts to the defendant to articulate a legitimate, non-[retaliatory] reason for the employment action.'" *Williams v. Harry's Nurses Registry, Inc.*, No. 24-34-cv, 2025 WL 842041, at *3 (2d Cir. Mar. 18, 2025) (summary order) (alteration in original; quoting *Mullins v. City of New York*, 626 F.3d 47, 53 (2d Cir. 2010)). "If the defendant meets its burden, the plaintiff must produce 'sufficient evidence to support a rational finding that the legitimate, non-[retaliatory] reasons proffered by the defendant were false, and that more likely than not [retaliation] was the real reason for the employment action.'" *Id.* (alterations in original; quoting *Mullins*, 626 F.3d at 53–54).

Defendants argue that Plaintiff cannot establish a prima facie retaliation case because she cannot prove the third and fourth elements; in Defendants' view, Plaintiff "suffered no adverse employment action and there was no connection between her complaint of discrimination and the

34

brief interruption of her email service." (Doc. 34-2 at 22.) Defendants suggest that the impact on Ms. Zimpfer's work email account did not rise to the level of an "adverse employment action" and also was not "related at all to her salary complaint." (*Id.* at 22–23.) Plaintiff disagrees on both points; she notes that the College disabled her email within a week of the date she submitted her internal sex-discrimination complaint. (Doc. 38 at 24–26.) The court begins with the "materially adverse" element.

In general, "[a]n action qualifies as 'materially adverse' if it is 'harmful to the point that [it] *could well dissuade a reasonable worker from making or supporting a charge of discrimination.*'" *Moll v. Telesector Res. Grp., Inc.*, 94 F.4th 218, 239 (2d Cir. 2024) (second brackets in original; quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006)). This is an objective standard, but a claim must be evaluated in context because "[t]he real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed." *Id.* (quoting *Burlington*, 548 U.S. at 69). "[I]n determining whether conduct amounts to an adverse employment action, the alleged acts of retaliation need to be considered both separately and in the aggregate, as even minor acts of retaliation can be sufficiently 'substantial in gross' as to be actionable." *Dapson v. City of Rochester*, No. 17-CV-6704, 2019 WL 591692, at *15 (W.D.N.Y. Feb. 12, 2019) (alteration in original; quoting *Hicks v. Baines*, 593 F.3d 159, 165 (2d Cir. 2010)).

Disabling an employee's workplace email access could be materially adverse "if . . . [the] plaintiff was harmed by it." *Del Signore v. Nokia of Am. Corp.*, 672 F. Supp. 3d 560, 571 (N.D. Ill. 2023). Here, Plaintiff has adduced no evidence that the impact on her College email account harmed her. At best, she has asserted that disabling her email "had the effect of

disrupting my communications with my colleagues and students" and that she "believed that Defendants were trying to get rid of" Dr. Brophy's June 5 email.  (Doc. 38-10 ¶ 27.)  But Plaintiff has not provided any details as to the "disrupted" communications with students and colleagues; there is no evidence as to how any communications delay during the week in question damaged Ms. Zimpfer or any of her students or colleagues.  And despite Ms. Zimpfer's belief that the College disabled her email to "get rid of" incriminating evidence, Dr. Brophy's June 5 email was not erased or destroyed.

Apart from the disabled email account, Plaintiff cites three other actions that she claims support her prima facie retaliation case.  First, she cites Dr. Brophy's June 5 statement: "I am sure you know what will happen if you don't return the contract, but that's a decision only you can make."  (Doc. 34-12 at 2.)  Ms. Zimpfer interpreted that as a "threat[] to fire me . . . for requesting that my salary be raised."  (Doc. 38-10 ¶ 28.)  The court agrees with Defendants, however, that even if that statement was a threat to terminate Ms. Zimpfer's employment, it does not support a prima facie retaliation claim.  *See, e.g.*, *Washington v. Securitas Sec. Servs. USA, Inc.*, 221 F. Supp. 3d 347, 357 (W.D.N.Y. 2016) ("Courts have routinely found the type of threat of which plaintiff complains to be insufficient to establish a prima facie case of retaliation."); *Moran v. Wegmans Food Mkts, Inc.*, 65 F. Supp. 3d 327, 331 (W.D.N.Y. 2014) ("[M]ere 'threats' to terminate one's employment do not, by themselves, constitute adverse employment actions."); *Bowen-Hooks v. City of New York*, 13 F. Supp. 3d 179, 212 (E.D.N.Y. 2014) ("A mere threat of discipline is not an adverse employment action.").

Second, Plaintiff asserts that, after she complained of unequal pay, "Defendants treated her with hostility and delay during attempts to coordinate accommodations needed for medical issues."  (Doc. 38 at 25.)  According to Ms. Zimpfer's declaration: "As compared to my cancer-

related discussions with Defendants, following my salary complaints in 2019, my discussions with Defendants about medical requests involved more requests for documents, more unjustified scrutiny, more follow-up questions, and more delayed responses." (Doc. 38-10 ¶ 29.) Defendants maintain that Ms. Zimpfer's medical requests in 2019 differed from her cancer-related requests for FMLA leave in 2017 and 2018 because, according to Ms. Flynn:

> [I]n the Fall of 2019 Ms. Zimpfer was not seeking time off from her teaching duties, but to teach her on-campus courses in an online format, which required the College to consider the logistics of granting such a request and the impact such a request may have upon the College, other faculty and students enrolled in Ms. Zimpfer's classes.

(Doc. 34-20 ¶ 25.)

For present purposes, the court accepts Ms. Zimpfer's assertion that the College applied greater scrutiny to her 2019 medical requests than it did to her 2017–2018 requests. Standing alone, such increased scrutiny might not be "materially adverse." *Cf. EEOC v. Bloomberg L.P.*, 967 F. Supp. 2d 816, 867 (S.D.N.Y. 2013) (alleged retaliatory conduct, including failure to act promptly on or excessively scrutinizing programming requests, was not materially adverse; no evidence that the conduct "amount[ed] to anything more than hostility or petty slights"). But in the context of other conduct, an employer's increased scrutiny of leave requests can support a prima facie retaliation case. *See, e.g.*, *Dapson*, 2019 WL 591692, at *15 (when considered as part of the "cumulative effect of the alleged retaliatory acts," increased scrutiny of overtime requests supported plausible retaliation claim); *Cortes v. City of New York*, 700 F. Supp. 2d 474, 483 (S.D.N.Y. 2010) (plausible pattern of retaliation where—in addition to other conduct including a transfer, circulating a memo in violation of procedures, and issuing exaggerated disciplinary charges—the deputy warden increased scrutiny of plaintiff's request for bereavement leave from his job as corrections officer as compared to other employee's requests). The court is therefore carefully considering all the conduct upon which Plaintiff relies.

Finally, the court considers Plaintiff's allegation in her complaint that the College "barred her from campus" during the week of October 22–28, 2019.  (*See* Doc. 1 ¶ 19.)  The evidence indicates that, on or about October 22, 2019, Ms. Nowak advised Ms. Zimpfer that until Ms. Zimpfer supplied "clarification" about her medical restriction, "we cannot have you start back on campus as we want to be sure we are abiding by your doctor's records."  (Doc. 34-4 at 33.)  In an email response later that day, Ms. Zimpfer stated, among other things: "I'm trying to understand why I am not allowed to return at this time."  (Doc. 34-26.)  Ms. Flynn replied the next day stating: "We are currently reviewing your recent doctor's note dated October 21, 2019.  We will get back to you as soon as possible."  (*Id.*)

Ms. Zimpfer argues that Ms. Flynn "failed to correct and thus actively contributed to Ms. Zimpfer's stated understanding that she had been banned."  (Doc. 38 at 26.)  It is true that Ms. Flynn's two-sentence reply on October 23, 2019, did not directly address the statement in Ms. Zimpfer's email from the day before stating that she was trying to understand why she was not "allowed to return."  But the next day—Thursday, October 24, 2019—the College confirmed that Ms. Zimpfer could return to in-person duties on Mondays, beginning on Monday, October 28.  Nothing about these events rises to the level of a materially adverse action.

After considering all this conduct individually and in the aggregate, the court agrees with Defendants that Plaintiff has failed to establish the "materially adverse" element of the prima facie retaliation claims.  Moreover, even if Plaintiff could establish her prima facie retaliation case, the court further concludes that Defendants have articulated legitimate, non-retaliatory reasons for all the conduct that might support the retaliation claims.  Those reasons included a need to investigate suspicious activity on Blackboard, a need to respond to medical requests that differed from Ms. Zimpfer's prior FMLA requests, and a need to consider and respond to Ms.

Zimpfer's requested modification to her prior arrangement to allow her to return to on-campus duties for one day per week. In light of the evidence presented in this case, the court further concludes that Ms. Zimpfer cannot show that any of these reasons were pretextual. Defendants are therefore entitled to summary judgment on the retaliation claims in Counts 5, 8, and 11.

### B.     Hostile Work Environment Claims (Counts 5, 10)

Defendants assert that the same operative facts underlie both the retaliation and hostile-work-environment claims and that Plaintiff's hostile-work-environment claims are really just elements of her retaliation claims. (*See* Doc. 34-2 at 19, 21.) Defendants further contend that any hostile-work-environment claim "outside of the context of retaliation . . . still fails." (*Id.* at 24.) Plaintiff maintains that "[a]lthough some of the factual support for Ms. Zimpfer's retaliation claim and hostile work environment claim overlap, the causes of action are distinct." (Doc. 38 at 29.) She contends that she has established a hostile-work-environment claim under both federal law and under the NYSHRL. (*Id.* at 28.)

The court agrees with Defendants that, insofar as Counts 5 and 10 are claims that the College imposed a hostile work environment in retaliation for engaging in protected activity, those claims cannot succeed for the reasons discussed above as to the retaliation claims. *Stevenson*, 2022 WL 179768, at *5 ("[A]n 'alleged retaliatory hostile work environment does not create two separate claims.'" (quoting *Dapson*, 2019 WL 591692, at *12). The court therefore evaluates Counts 5 and 10 insofar as they are brought outside the retaliation context.

### 1.     Title VII Hostile-Work-Environment Claim (Count 5)

The parties do not dispute the relevant law governing hostile work environment claims under Title VII.

> To prove a hostile work environment in violation of Title VII, a plaintiff must establish both objective and subjective elements. The misconduct shown must have

been "severe or pervasive enough to create an objectively hostile or abusive work environment," that is, "an environment that a reasonable person would find hostile or abusive." And the victim must have "subjectively perceive[d] the environment to be abusive." Whether a particular environment is objectively "'hostile' or 'abusive' can be determined only by looking at all the circumstances."

*Moll*, 94 F.4th at 228–29 (alteration in original; citations omitted; quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21, 23 (1993)). The relevant circumstances may include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* at 229 (quoting *Harris*, 510 U.S. at 23).

Here, there is evidence that Ms. Zimpfer subjectively perceived the environment to be abusive, based on Dr. Brophy's June 5 email, the disabling of her email account, the scrutiny of her medical leave requests, and her belief that she was barred from campus during the week of October 22–28, 2019. The court agrees with Defendants, however, that the evidence does not meet the objective standard. The challenged conduct occurred at discrete times over the course of several months. None of the conduct was physically threatening. Although Ms. Zimpfer's medical leave might support the conclusion that she experienced the conduct as severe and humiliating, the objective evidence shows that the College's communications with Ms. Zimpfer were careful and professional. The disruption to Ms. Zimpfer's College email and her medical leave may have interfered with her work performance to some extent, but there is no evidence that the interference was unreasonably great; indeed, Ms. Zimpfer was able to continue teaching her classes remotely during the relevant times. The Court concludes that the College is entitled to summary judgment on Count 5.

### 2.    NYSHRL Hostile-Work-Environment Claim (Count 10)

As to the NYSHRL hostile-work-environment claim, Defendants cite authority indicating that the elements of such a claim are the same as the elements under Title VII. *See Black v.*

40

*Buffalo Meat Serv., Inc.*, No. 15-CV-49, 2021 WL 2043006, at *11 (W.D.N.Y. May 21, 2021).

But the complaint in *Black* was filed in 2015—before the 2019 amendment to the NYSHRL that

added § 296(1)(h).  *See Reed v. Fortive Corp.*, No. 21-CV-6312, 2023 WL 4457908, at *11 n.19

(W.D.N.Y. July 11, 2023) (noting that amendments to the NYSHRL adding § 296(1)(h),

effective October 11, 2019, changed the standard "to eliminate the requirement that harassing or

discriminatory conduct be 'severe or pervasive' for it to be actionable" (quoting *Maiurano v.*

*Cantor Fitzgerald Sec.*, No. 19-cv-10042, 2021 WL 76410, at *3 & n.2 (S.D.N.Y. Jan. 8,

2021))); *see also, e.g.*, *Elco v. Aguiar*, 208 N.Y.S.3d 696, 650 (App. Div. 2024) ("Where a

plaintiff files a claim under section 296(1)(h) on or after October 11, 2019, the plaintiff need not

establish that the alleged harassment would be considered severe or pervasive under precedent

applied to harassment claims." (internal quotation marks omitted)).

Ms. Zimpfer filed her complaint in this case on February 9, 2021—after § 296(1)(h) took

effect.  Therefore, the more protective standard currently in effect under the NYSHRL applies in

this case.  The applicable NYSHRL standard "prohibits conduct that results in 'inferior terms,

conditions or privileges of employment."  *Reed*, 2023 WL 4457908, at *11 n.19 (quoting

*Maiurano*, 2021 WL 76410, at *3 n.2).  The sole argument for dismissal of Count 10 as against

Hilbert is the College's assertion that the work environment was not "objectively hostile."

Because the College has not addressed Plaintiff's observation that the NYSHRL standard is

different, and has not articulated how the analysis of the objective prong should proceed under

that more protective standard, the court concludes that the College is not entitled to summary

judgment on Count 10.

**IV.    Aiding-and-Abetting Claims (Counts 13–15, 19–21)**

Counts 13–15 and 19–21 are all aiding-and-abetting claims brought under the NYSHRL

against the individual defendants.  The College argues that, assuming any of Ms. Zimpfer's

claims against the College survive to establish the requisite predicate liability, Plaintiff still

cannot prove that the individual defendants "actually participate[d]" in unlawful conduct.

(Doc. 34-2 at 29 (alteration in original; quoting *McHenry v. Fox News Network, LLC*,

510 F. Supp. 3d 51, 68 (S.D.N.Y. 2020)).)  Ms. Zimpfer asserts that the individual defendants

aided and abetted the College's gender discrimination "because, despite their knowledge of the

same, they took no steps to remediate the intentional pattern of unequal pay."  (Doc. 38 at 29.)

According to Plaintiff, the individual defendants independently discriminated and

retaliated against her because:

> [E]ach took active steps to perpetuate and justify Hilbert's unequal pay of Ms.
> Zimpfer by collectively threatening to fire her if she did not return her contract.
> They further collaborated to disable her email in response to her complaints.  Flynn
> then independently continued to subject Ms. Zimpfer to a hostile work
> environment; Lantzky and Brophy continued to fail to raise Ms. Zimpfer's salary;
> and Brophy, Flynn, and Lantzky collaborated with Hilbert to "cover up" and justify
> their discriminatory practices through a flawed salary study.

(Doc. 38 at 29 (footnote and citation omitted).)  The individual defendants insist that the facts do

not support a conclusion that any of them "actually participated" in any unlawful conduct.

(Doc. 39 at 12.)

The NYSHRL includes a provision making it "an unlawful discriminatory practice for

any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this

article, or to attempt to do so."  N.Y. Exec. L. § 296(6).  Thus: "[A]n individual defendant may

be held liable under the aiding and abetting provision of the NYSHRL if he actually participates

in the conduct giving rise to a discrimination claim."  *Felton v. Monroe Cmty. Coll.*, 579 F. Supp.

3d 400, 410 (W.D.N.Y. 2022) (alteration in original; quoting *Rojas v. Roman Catholic Diocese*

*of Rochester*, 660 F.3d 98, 107 n.10 (2d Cir. 2011)). But such an aiding-and-abetting claim "is only a viable theory where an underlying violation has taken place." *Housel v. Rochester Inst. of Tech.*, 6 F. Supp. 3d 294, 316 (W.D.N.Y. 2014) (quoting *Falchenberg v. N.Y. State Dep't of Educ.*, 338 F. App'x 11, 14 (2d Cir. 2009)). "Additionally, 'aiding and abetting liability does not attach to a supervisor unless the facts alleged demonstrate that the aider and abettor shared the intent or purpose of the principal actor.'" *Klymn v. Monroe Cnty. Sup. Ct.*, 641 F. Supp. 3d 6, 30 (W.D.N.Y. 2022) (quoting *Mondelo v. Quinn, Emanuel, Urquhart & Sullivan, LLP*, No. 21-CV-02512, 2022 WL 524551, at *13 (S.D.N.Y. Feb. 22, 2022)).

Here, for the reasons discussed above, Defendants are entitled to summary judgment on each of the retaliation claims, thus the individual defendants cannot be liable for aiding and abetting retaliation, and they are entitled to summary judgment on Counts 19–21. Defendants are also entitled to summary judgment on the gender discrimination claims in Counts 3 and 9, leaving the pay-related discrimination claims in Counts 1 and 7 as the only potential underlying violations for the aiding-and-abetting claims in Counts 13–15. As discussed above, however, those claims do not require a showing that the College had any discriminatory intent. And the court granted summary judgment to Defendants on the gender discrimination claims precisely because Plaintiff's evidence does not support a finding of discriminatory intent by the College. Absent such an intent on the part of the College, Plaintiff cannot show that any of the individual defendants shared that intent. The individual defendants are therefore entitled to summary judgments on Counts 13–15.

## Conclusion

Defendants' Motion for Summary Judgment (Doc. 34) is MOOT IN PART, GRANTED IN PART, and DENIED IN PART. The motion is moot insofar as it seeks summary judgment

on the now-abandoned claims in Counts 2, 4, 6, 12, and 16–18.  The motion is denied as to the

pay-based gender discrimination claims in Counts 1 and 7 and as to the hostile-work-

environment claim against the College in Count 10.  The motion is otherwise granted.

      Dated this  25th day of June, 2025.

                                        Geoffrey W. Crawford, Judge
                                        United States District Court